[No. A089524 First Dist., Div. One. Nov. 21, 2000.]

COUNTY OF SONOMA, Plaintiff and Respondent, v.
COMMISSION ON STATE MANDATES, Defendant and Respondent;
DEPARTMENT OF FINANCE et al., Real Parties in Interest and
Appellants;
COUNTY OF AMADOR et al., Interveners and Respondents.

COUNSEL

Bill Lockyer, Attorney General, Manuel M. Medeiros, Assistant Attorney General, Andrea Lynn Hoch, Kenneth R. Williams and Daniel G. Stone, Deputy Attorneys General, for Real Parties in Interests and Appellants.

Olson, Hagel, Leidigh, Waters & Fishburn, N. Eugene Hill, Deborah B. Caplan and Lance H. Olson for Commission on State Mandates as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Steven M. Woodside, County Counsel, Kathleen A. Larocque and Sally B. McGough, Deputy County Counsel, for Plaintiff and Respondent and for Interveners and Respondents.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Respondent.

McMurchie, Weill, Lenahan, Lee & Slater, David W. McMurchie and Vicki E. Hartigan for California Special Districts Association, California Association of Recreation and Park Districts, California Association of Public Cemeteries and Mosquito and Vector Control Association of California as Amici Curiae on behalf of Plaintiff and Respondent.

No appearance for Defendant and Respondent.

Burke, Williams & Sorensen and Leland C. Dolley for 95 California Cities as Amici Curiae.

## OPINION

**MARCHIANO, J.**—In response to a budget crisis in 1992, the Legislature reduced the share of property taxes previously allocated to local governments and simultaneously placed an equal amount of property tax revenues into Educational Revenue Augmentation Funds (ERAF's) for distribution to school districts.[1] The County of Sonoma (the County) then sought reimbursement pursuant to article XIII B, section 6 of the California Constitution (section 6), contending that the ERAF legislation amounted to the imposition of a state mandated program or higher level of service.[2] The Commission on State Mandates (Commission) determined that section 6 does not apply to this reallocation of tax revenues. The superior court disagreed and issued a writ of mandate ordering the Commission to conduct further proceedings to determine the amount of reimbursement due to the County. The issue raised by this appeal is whether enactment of the ERAF legislation resulted in costs to the County for a state mandated new program or higher level of service, thereby requiring reimbursement pursuant to section 6.

We conclude that the state is not obligated to reimburse local governments for this change in the allocation of property tax revenues. The reallocation of revenue resulting from the challenged legislation does not result in reimbursable "costs" within the meaning of section 6. Furthermore, shifting the percentage of responsibility for a program that was jointly funded by state and local governments at the time section 6 became effective is not the

---

[1]The challenged legislation added Revenue and Taxation Code section 97.03 (as enacted by Stats. 1992, ch. 699, § 12, p. 3093 and ch. 700, § 4, p. 3120, now Rev. & Tax. Code, §§ 97.2 and 97.3, see *id.*, § 97.2, subd. (f)) and Education Code section 41204.5 (ERAF expenditures deemed to have been in effect in 1986-1987 fiscal year for purposes of the calculation of the percentage of General Fund revenues appropriated toward minimum educational funding that year).

[2]Section 6 provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

imposition of a "new program or higher level of service." (*Ibid.*) We reverse the trial court's judgment.

## BACKGROUND

The challenged legislation added section 97.03 to the Revenue and Taxation Code. The legislation reduced the amount of property tax revenue to be allocated to local government pursuant to a specified formula and allocated an equal amount of revenue to the ERAF for distribution to county school districts.[3] (Rev. & Tax. Code, § 97.2.) At the same time, the Legislature enacted Senate Bill No. 766 (1991-1992 Reg. Sess.), which added section 41204.5 to the Education Code. The new Education Code provision had the effect of decreasing the amount of the state's contribution to the constitutionally mandated minimum funding level for education in the amount of the allocation to the county ERAF's.[4]

Our resolution of the issues presented by this appeal is aided by a review of the changes in the state's role in school finance, including the *Serrano* cases, Proposition 13, and the post-Proposition 13 legislative scramble to replace property tax revenues in the state budgetary scheme. Understanding

---

[3]Former Revenue and Taxation Code section 97.03, enacted in 1992, is now located in Revenue and Taxation Code sections 97.2 and 97.3. (Stats. 1992, ch. 699, § 12, p. 3093; Stats. 1992, ch. 700, § 4, p. 3120; see Historical and Statutory Notes, 59 West's Ann. Rev. & Tax. Code (1998 ed.) foll. former §§ 97.01 to 97.05, p. 174.) Revenue and Taxation Code section 97.2 provides: "Notwithstanding any other provision of this chapter, the computations and allocations made by each county pursuant to Section 96.1 or its predecessor section shall be modified for the 1992-93 fiscal year pursuant to subdivisions (a) to (d), inclusive, and for the 1997-98 and 1998-99 fiscal years pursuant to subdivision (e), as follows: [¶] (a)(1) Except as provided in paragraph (2), the amount of property tax revenue deemed allocated in the prior fiscal year to each county shall be reduced by the dollar amounts indicated as follows, multiplied by 0.953649: [list of dollar amounts for the 58 California counties] [¶] . . . [¶] (d)(1) The amount of property tax revenues not allocated to the county, cities within the county, and special districts as a result of the reductions calculated pursuant to subdivisions (a), (b), and (c) shall instead be deposited in the Educational Revenue Augmentation Fund to be established in each county. The amount of revenue in the Educational Revenue Augmentation Fund, derived from whatever source, shall be allocated pursuant to paragraphs (2) and (3) to school districts and county offices of education, in total, and to community college districts, in total, in the same proportion that property tax revenues were distributed to school districts and county offices of education, in total, and community college districts, in total, during the 1991-92 fiscal year."

[4]Education Code former section 41204.5 stated that: "for the 1992-1993 fiscal year and each fiscal year thereafter, the percentage of 'General Fund revenues appropriated for school districts and community college districts, respectively, in fiscal year 1986-1987,' for purposes of paragraph (1) of subdivision (b) of Section 8 of article XVI of the California Constitution, shall be deemed to be the percentage of General Fund revenues that would have been appropriated for those entities if the [1992 amendments to the Revenue and Taxation Code] . . . had been operative for the 1986-87 fiscal year."

which entity had the responsibility for funding education on July 1, 1980, when section 6 became effective is necessary for an analysis of the issues raised in this case. The legislative action in 1992 did not spring up full-grown like Venus from the sea, but rather grew out of decades of developments in school funding and tax restrictions. Placing the issue in the proper historical context makes it clear that school finance has always been a partnership involving state and local financing buffeted at times by the external forces of initiatives, variable economic conditions in California, and court decisions interpreting constitutional provisions.

After reviewing the litigation, legislation, initiative measures, and specific events leading to this appeal, we proceed to an analysis of the purpose and requirements of subvention for state-mandated programs and conclude that neither a cost nor a new program has been created by the ERAF legislation. We begin with a historical review of the fluid nature of school funding in California.

*The 1960's: State and Local Roles in School Funding*

In the late 1960's, California public schools derived over 90 percent of their financial support from local taxes on real property, supplemented by the State School Fund.[5] (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591 & fn. 2 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] (*Serrano I*).) The Legislature authorized local governments to levy taxes on real property to meet the needs of the district's schools. Most of the balance of a school district's revenue came from the state. (*Id.* at p. 592.) Specifically, in this pre-*Serrano I* and pre-Proposition 13 period, 55.7 percent of school revenues came from local property taxes and 35.5 percent from state aid.[6] (*Serrano I, supra,* at p. 591, fn. 2.) During this time the Legislature determined the manner of school financing shared by local government.

---

[5]"The Constitution of 1849 directed the Legislature to 'provide for a system of common schools, by which a school shall be kept up and supported in each district . . . .' (Cal. Const. of 1849, art. IX, § 3.) That constitutional command, with the additional proviso that the school maintained by each district be 'free,' has persisted to the present day. (Cal. Const., art. IX, § 5.) [¶] In furtherance of the State system of free public education, the Constitution also . . . establishes a State School Fund . . . ." (*Butt v. State of California* (1992) 4 Cal.4th 668, 680 [15 Cal.Rptr.2d 480, 842 P.2d 1240].)

Article XVI, section 8 of the California Constitution provides for the State School Fund as follows: "From all state revenues there shall first be set apart the moneys to be applied by the State for support of the public school system and public institutions of higher education." (Cal. Const., art. XVI, § 8, subd. (a).)

[6]State aid was in two forms: basic aid, consisting of a flat dollar amount per pupil; and equalization aid, which was distributed in inverse proportion to the wealth of the district. (*Serrano v. Priest* (1976) 18 Cal.3d 728, 739 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*).)

*1971-1976: The Serrano Litigation*

The disparity created by reliance on the value of a district's real estate was challenged in 1971 on constitutional grounds in *Serrano I.* The court determined that the system of school financing impermissibly discriminated based on the wealth of the district. (*Serrano I, supra,* 5 Cal.3d at pp. 598, 614-615.) The result was that the quality of a child's education was irretrievably tied to the wealth of the residents of the district. (*Id.* at pp. 599-601.) The *Serrano I* court remanded the case for a trial on the merits. (*Id.* at p. 619.)

During the trial of the remanded *Serrano I* case, the Legislature passed new legislation that increased the amount of state aid to schools, limited expenditures and tied the limitations to inflation adjustments so that districts with higher local revenues received smaller upward adjustments. (*Serrano II, supra,* 18 Cal.3d at pp. 736-737, 742-743.) At this juncture in school funding, financial responsibility was still primarily with local government, with the state supplying aid in an attempt to remedy the deficiencies identified by the Supreme Court. The Legislature continued to determine the manner of school financing.

In *Serrano II,* the court again determined that the state's school finance structure violated the California Constitution despite the legislative attempts to remedy the perceived discrimination. (*Serrano II, supra,* 18 Cal.3d at p. 768.) The court found that the system impermissibly "renders the educational opportunity available to the students of this state a function of the taxable wealth [per pupil] of the districts in which they live . . . ." (*Id.* at p. 769.)

After *Serrano II,* the Legislature passed Assembly Bill No. 65 (1977-1978 Reg. Sess.) to increase the ability of poorer districts to raise funds by providing state assistance if actual revenues fell below a scheduled amount. In addition, specified "squeeze" formulas served to decrease the inflation adjustment for wealthier districts and to transfer revenues from high to low wealth districts. (Stats. 1977, ch. 894, § 16.5, p. 2681; Comment, *Inequalities in California's Public School System: The Undermining of Serrano v. Priest and the Need for a Minimum Standards System of Education* (1999) 32 Loyola L.A. L.Rev. 583, 599.) It has been said that the Legislature's attempt to respond to the *Serrano* decisions resulted in "a true 'power equalizing' system whereby local property tax revenue was to be redistributed from tax-rich to tax-poor districts." (Comment, *Educational Financing Mandates in California: Reallocating the Cost of Educating Immigrants Between State and Local Governmental Entities* (1994) 35 Santa Clara L.Rev. 367, 392.) School finance remained, however, a jointly funded system.

*1978: Proposition 13 and the Legislative Response*

Before Assembly Bill No. 65 could take effect, the voters passed Proposition 13 in 1978, which fundamentally restricted the ability of local governments to raise funds to finance schools through local property tax revenues. Proposition 13 involved several elements, including limitations on the tax rate on real property and on increases in the assessed value of real property. The measure also limited any future changes in state taxes to those passed by two-thirds of the Legislature, and future changes in local tax increases to those imposed by a two-thirds vote of the electors. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 220 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador Valley*).)

The consequences of Proposition 13 were perceived as catastrophic. "Although California is renowned for its earthquakes, no tremor of high Richter-scale proportion has shaken it quite like the enactment of Proposition 13. Every local entity in the state feared potential economic collapse in the aftershock of that momentous decision by the people." (*Jarvis v. Cory* (1980) 28 Cal.3d 562, 573 [170 Cal.Rptr. 11, 620 P.2d 598] (*Jarvis*).) Despite the dire predictions, Proposition 13 was upheld as a valid constitutional amendment in *Amador Valley, supra,* 22 Cal.3d 208.

"Because the state had accrued a sizeable surplus of funds, it was immediately called upon to help maintain local governments through the initial period of drastic revenue loss." (*Jarvis, supra,* 28 Cal.3d at p. 573.) Proposition 13 provided that property taxes, at the reduced amount, were to be "collected by the counties and apportioned according to law to the districts within the counties." (Cal. Const., art. XIII A, § 1, subd. (a).) As noted by the Legislative Analyst's comment in the California voters pamphlet, there was no state law at the time that provided for the distribution of these revenues. (Ballot Pamp., Primary Elec. (June 6, 1978) pp. 56-57.) The Legislature acted quickly to fill this void.

The Legislature enacted Senate Bill No. 154 (1977-1978 Reg. Sess.), an emergency "bailout" bill, effective for the 1978-1979 fiscal year, providing that the state would distribute the reduced pool of property tax revenues. (Stats. 1978, ch. 332, § 36, p. 706; *Jarvis, supra,* 28 Cal.3d at p. 574.) The state also provided block grants and relieved counties of the costs of various health and welfare programs. Additional state aid was allocated to the public schools on a sliding scale, to attempt to guarantee to each school district 85 percent (for higher revenue districts) to 91 percent (for lower revenue districts) of the revenue it would have been allocated if Assembly Bill No.

65 had been implemented. (*Arvin Union School Dist. v. Ross* (1985) 176 Cal.App.3d 189, 196 [221 Cal.Rptr. 720]. Senate Bill No. 154 was a temporary one-year measure that increased state aid to schools, but did not place full financial responsibility on the state.

*1979-1980: The Assembly Bill No. 8 Shift of Funds to Local Governments*

The most important legislation, for purposes of this appeal, is Assembly Bill No. 8 (1979-1980 Reg. Sess.), the long-term attempt to address the post-Proposition 13 financial problems of schools and other local entities. (Stats. 1979, ch. 282, p. 959.) The initial provisions of Assembly Bill No. 8 took effect in the 1979-1980 fiscal year. The long-range financing provisions of Assembly Bill No. 8 did not become effective until the 1980-1981 year.

It is undisputed and a part of the administrative record in this case, that in 1979, the Legislature reduced the share of local property tax revenues allocated to schools from approximately 53 percent to approximately 35 percent and made up the difference with state funds. The property tax revenue allocated to counties was increased from approximately 30 percent to approximately 32 percent, the allocation to cities was increased from approximately 10 to approximately 15 percent and the allocation to special districts was increased from approximately 7 to approximately 18 percent. (See also Legis. Analyst, analysis of Assem. Bill No. 8 (1979-1980 Reg. Sess.) as amended June 21, 1979.)

Each school district received a share of the reduced pool of property taxes in the county in proportion to the share received in the 1978-1979 school year. Additional aid from state funds was supplied to replace the reduction in property taxes. (Assem. Conf. Com. on Long-term Local Gov. & School Financing, Rep. on Assem. Bill No. 8 (1979-1980 Reg. Sess.) as amended July 19, 1979, p. 8.) Although in the aftermath of Proposition 13, the state's percentage of support for schools increased from the pre-*Serrano* days, joint state and local funding responsibility for school districts existed when section 6 became effective on July 1, 1980. (Cal. Const., art. XIII B, § 10.)

*The 1992 Reallocation to ERAF's*

School funding practices remained relatively stable until enactment of the 1992-1993 legislation that forms the basis for the claim of subvention in this case. "The State of California faced an unprecedented budgetary crisis at the outset of fiscal year 1991-1992, with expenditures projected to exceed revenues by more than $14 billion." (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 163 [6 Cal.Rptr.2d 714].)

In 1992, the Legislature enacted the bill that was subsequently codified as Revenue and Taxation Code section 97.2. That statute reduced the post-Proposition 13 allocation of property taxes to local governments and allocated amounts equal to those reductions to county ERAF's for distribution to the county schools. (Stats. 1992, ch. 699, § 12, p. 3093; Stats. 1992, ch. 700, § 4, p. 3120 [Sen. Bill No. 844 (1991-1992 Reg. Sess.) rewriting the provisions of the prior bill]; see Historical and Statutory Notes, 59 West's Ann. Rev. & Tax. Code (1998 ed.) foll. former §§ 97.01 to 97.05, p. 174.)

By 1993, the recessionary economy and the growing revenue requirements of schools jeopardized the state's ability to finance even essential state functions. Given the bleak economic circumstances, the Governor determined that education, along with public safety, had to receive priority over state funding of other local services. The result was that the 1993-1994 budget again reduced the amount of the post-Proposition 13 bailout to local government and reallocated local property tax revenues to ERAF's.[7] (Governor's Budget Summary, 1993-1994, pp. 44, 92-93.)

The ERAF reallocation design can be summarized as requiring reduction of property tax revenues previously allocated to counties by use of a specified formula, deposit of the reduced amounts into ERAF's, and distribution of the ERAF funds to schools. Another portion of the same legislation deemed the ERAF revenues to be part of the state General Fund revenues for purposes of calculating the minimum educational funding guarantee under Proposition 98.[8] The overall result of these statutes is that the tax revenues of the counties are decreased, school revenues remain the same, and the minimum school funding guarantee of Proposition 98 is satisfied in part by the ERAF funds. This legislative adroitness fulfilled the funding of Proposition 98 by reallocating available finite funds from one local governmental

---

[7]The use of revenue allocation funds as revenue spreading mechanisms is not confined to the ERAF's at issue in this case. In the wake of Proposition 13, the Legislature created other special allocation funds, for example, the Special District Augmentation Fund to share funds among special districts within counties. (*American River Fire Protection Dist. v. Board of Supervisors* (1989) 211 Cal.App.3d 1076 [259 Cal.Rptr. 858]; see also Gov. Code, §§ 30054, 30055 [Public Safety Augmentation Fund].)

[8]As explained by the Legislative Analyst, California Constitution, article XVI, section 8, approved by the voters in 1988 as Proposition 98, "[e]stablishes a minimum level of funding for public schools and community colleges. [¶] [and] [r]equires the state to spend any excess revenues, up to a specified maximum, for public schools and community colleges." (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) p. 78.) The minimum level is established by use of one of three formulas, the first of which references the percentage of General Fund revenues appropriated to schools in fiscal year 1986-1987.

entity to another. (Legis. Analyst, Rep. to Joint Legis. Budget Com., analysis of 1993-1994 Budget Bill, p. 90.)[9]

Concurrently with the ERAF legislation, and thereafter, the state cushioned the loss of revenue to local governments through a variety of mitigation measures, including an additional sales tax, that was established in the Constitution by the voters in 1993, trial court funding reform, supplemental funding for special police protection districts, grants of authority to counties to reduce general assistance levels, loans for property tax administration and a one-time mitigation of $292 million. The effects of the ERAF legislation and the state's efforts to offset those effects continue to the present time. (Governor's Budget Summary, 1999-2000, pp. 41-43; Legis. Analyst, Rep. to Joint Legis. Budget Com., The 1999-00 Budget: Perspectives and Issues, pp. 154-157.)

The ERAF legislation has been challenged and upheld. In *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442 [29 Cal.Rptr.2d 103] (*Sasaki*) and *San Miguel Consolidated Fire Protection Dist. v. Davis* (1994) 25 Cal.App.4th 134 [30 Cal.Rptr.2d 343] (*San Miguel*), the courts upheld the legislation against constitutional challenges. The petitioner in *San Miguel* also argued that it was entitled to offset reimbursement owed by the state against any shifting of property tax revenues. (*San Miguel, supra,* 25 Cal.App.4th at pp. 142-143.) The court rejected the claim of offset as premature, noting that claims for payment had been submitted to the state but had not yet been adjudicated. (*Id.* at pp. 155-156.)

This case now raises the issue foreshadowed in *San Miguel.*[10] The counties here argue that the challenged reallocation of property tax revenues is a state-mandated cost of a new program, entitling the affected local governments to reimbursement. (Gov. Code, § 17500 et seq.; § 6.)

---

[9]As stated in the Governor's Budget Summary for 1993-1994, the state's response to Proposition 13 had included state assumption of approximately $1.3 billion of the county health and welfare expenses and a shift of approximately $800 million of local property tax revenue from school funding to cities, counties, and special districts. Allocations to schools were decreased, and the state assumed a larger proportion of responsibility for funding schools. Prior to Proposition 13, 53 percent of local property taxes went to schools. In 1991-1992, only 35 percent went to the schools. (Governor's Budget Summary, 1993-1994, p. 43.)

[10]After briefing was complete in this case, but prior to oral argument, the Third District issued its opinion in *City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266 [99 Cal.Rptr.2d 333] (*City of El Monte*), in which a redevelopment agency sought reimbursement for a statute that required the agency to make payments to an ERAF. The court denied reimbursement, for the dual reasons that the agency was not required to expend tax revenues and the court's view that the transfer of costs was from one local entity to another, not from the state to local government.

*Background of This Appeal — The Test Claim*

After the adverse decisions for the county and special district in *Sasaki, supra,* 23 Cal.App.4th 1442, and *San Miguel, supra,* 25 Cal.App.4th 134, the County and 47 other counties (collectively, the Counties) filed a test claim with the Commission, pursuant to the provisions of section 6 and the implementing legislation of Government Code section 17500 et seq.[11] The County claimed that it had been subjected to a new program or an increased level of service for which subvention was required. The "new" program or service was identified as the state's shift of local property tax revenues to ERAF's and the contemporaneous reduction in the amount the state contributed to meet the Proposition 98 minimum funding goal for schools.[12] The County argued that these two actions combined to force local government to bear the financial burden of Proposition 98 funding that had formerly been financed solely by the state.

On November 30, 1998, following public hearings on the test claim, the Commission issued its decision rejecting the claim. The Commission based its denial of the test claim on its conclusion that although the test claim legislation reduced county revenues, it did not impose a spending program.

*The Action in the Superior Court*

On March 17, 1999, the County challenged the Commission's decision by filing both a petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5 and a complaint for declaratory relief in the superior court.

The petition alleged that the ERAF legislation imposed a new program or higher level of service and required reimbursement of nearly $5 billion to local governments for the 1996-1997 and 1997-1998 fiscal years. The second cause of action for declaratory relief alleged the same facts, but added that by the Legislature's actions in shifting the allocation of funds to the ERAF's and deeming the shift to have occurred in 1986-1987 for purposes of paragraph (b)(1) of Proposition 98, the state reduced the percentage of state funds allocated to education from 40 percent to 34 percent. The second cause of action requested a declaration that the state may not exercise its power to allocate property taxes without reimbursing local

---

[11]Government Code section 17521 defines a test claim as: "the first claim, including claims joined or consolidated with the first claim, filed with the commission alleging that a particular statute or executive order imposes costs mandated by the state."

[12]The challenged statutes were listed as Revenue and Taxation Code sections 95 et seq., 95.1 et seq., 97.01 et seq., 97.03, 97.035, 97.038 and Education Code section 41204.5.

governments, that the California Constitution requires reimbursement whenever the state shifts property tax revenues from one local entity to another for state purposes, that funding education is a state obligation, and that the state cannot increase the percentage of public school funding derived from property tax revenue without reimbursing local governments in an equal amount. In May of 1999, the court allowed an additional 53 counties to intervene in the action.

On October 21, 1999, the court granted a motion to dismiss the second cause of action, finding that the request for declaratory relief addressed issues that were neither definite nor concrete in the factual context of the case, which involved the Commission's rejection of the test claim. On the same date, after reviewing the administrative record, the briefs of the parties, and hearing argument, the court filed its statement of decision finding that the ERAF legislation: "created a new program or higher level of service which requires reimbursement under Article XIII B, section 6 of the California Constitution since the shift of local property taxes compels the counties to accept financial responsibility in whole or in part for a program which was required to be funded by the State by the enactment of Proposition 98." The requested writ of mandate issued on November 18, 1999. The State of California, California Department of Finance, and the Director of the Department of Finance appealed from the judgment directing issuance of the writ.[13]

Based on our review of the relevant historical events, focusing on the language of section 6 and the challenged legislation, we determine that the trial court improperly looked to the use made of the reallocated revenues instead of whether the legislation mandates costs due to a new program or higher level of service for a program previously funded entirely by the state as required by the Constitution, interpretive case law, and implementing statutes.

## DISCUSSION

Decisions of the Commission are reviewed by petition in the superior court pursuant to Code of Civil Procedure section 1094.5, "on the ground that the commission's decision is not supported by substantial evidence. The court may order the commission to hold another hearing regarding the claim

---

[13]We granted leave for the following organizations to file briefs as amici curiae: the Commission on State Mandates, in support of appellant, and 95 California cities, the Howard Jarvis Taxpayers Association, the California Special Districts Association, California Association of Recreation and Park Districts, California Association of Public Cemeteries, and the Mosquito and Vector Control Association of California, in support of respondent.

and may direct the commission on what basis the claim is to receive a rehearing." (Gov. Code, § 17559, subd. (b).) ■ Although the statute references a substantial evidence standard of review, "[t]he determination whether the statutes here at issue established a mandate under section 6 is a question of law." (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109 [61 Cal.Rptr.2d 134, 931 P.2d 312] (*County of San Diego*).) The facts underlying this case were undisputed, thus we review the issues as questions of law.

*Limited Scope of Issues Addressed in This Appeal*

It is important at the outset of this discussion to clarify the scope of the issues raised by this appeal and identify issues that are not properly before us on an appeal from a subvention decision. As our Supreme Court cautioned a decade ago, in evaluating a claim for subvention, we cannot become entangled in consideration of where the benefit of questioned state action falls. In *City of Sacramento v. State of California* (1990) 50 Cal.3d 51 [266 Cal.Rptr. 139, 785 P.2d 522] (*City of Sacramento*), the court cautioned that subvention does not depend on "whether the 'benefit' of a state-imposed local requirement falls principally at the state or local level. Attempts to apply such a 'benefit' test to the myriad of individual cases could easily produce debates bordering on the metaphysical. Nothing in the language or history of article XIII B, or prior subvention statutes, suggests an intent to force such debates upon the Legislature each time it considers legislation affecting local governments." (*Id.* at p. 70, fn. 14.)

In addition, this appeal does not encompass an attack on the constitutionality, wisdom, or propriety of the state's budget process that resulted in the ERAF legislation. The original complaint in the superior court contained a second cause of action for declaratory relief requesting a wide-ranging declaration that, among other things, funding education is a state obligation, the state may not exercise its power to allocate tax revenues in a manner that interferes with home rule powers, section 6 established the state's obligation to fund education solely from the General Fund, and Assembly Bill No. 8 froze the amount of property taxes that may be allocated to schools. However, that cause of action was dismissed by the trial court, and no appeal or cross-appeal was filed regarding that claim. Issues raised by the second cause of action are not properly before us in this appeal by the state.[14]

Finally, we note that the court in *Sasaki, supra,* 23 Cal.App.4th 1442, held that the county plaintiffs in that case lacked standing to challenge the

---

[14]All constitutional issues preserved by language in the prayer accompanying the first cause of action are discussed.

constitutionality of Education Code section 41204.5. That court reasoned that the matter of how the state treats revenues it allocates to educational entities may concern the educational entities, but no theory would entitle a county to a writ of mandate negating that code section. (*Sasaki, supra,* 23 Cal.App.4th at p. 1449.) In *San Miguel, supra,* 25 Cal.App.4th 134, the court acknowledged a question as to whether special districts could challenge the constitutionality of the ERAF legislation, but indicated that individual taxpayer plaintiffs in that case had standing. (*Id.* at pp. 143-145.) The only plaintiffs in this action are counties. Thus, the only issues properly before us are those bearing on the question of whether the decision to reallocate a portion of property tax revenues in the challenged years results in a state mandated cost for a new program or higher level of service such that subvention is required. We have no wish to become enmeshed in the metaphysical debates that the court warned against in *City of Sacramento.* (*City of Sacramento, supra,* 50 Cal.3d at p. 70.) This case does not involve whether it was legally prudent to rob Peter to pay Paul.[15] Consequently, we decline to expand our consideration to issues of the identity of the beneficiary of the allocation or the constitutionality of legislation relating to school entities. We confine our discussion to the question of subvention.

*Rules of Constitutional Construction*

■ Unlike the federal Constitution, our state Constitution sets out limitations on the power of the Legislature. (*California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1531 [7 Cal.Rptr.2d 699] (*Hayes*).) The state Legislature has the " ' "entire lawmaking authority of the state . . . ." ' " (*Ibid.*) Furthermore, " ' "all intendments favor the exercise of the Legislature's plenary authority . . . ." ' " (*Id.* at p. 1532.) Any doubts regarding the Legislature's power are resolved in favor of the exercise of that power. Limitations on that power are strictly construed and are not extended by implication.

■ The principle that the Legislature may exercise all powers not denied to it by the Constitution " 'is of particular importance in the field of taxation, in which the Legislature is generally supreme. . . . "[t]he provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it. [Citations.] Its power in the field of

---

[15]Difficult fiscal decisions have always occupied government policy makers. In 1560, after the Abbey Church of St. Peter, Westminster joined the London Diocese, many of its assets were appropriated to repair St. Paul's Cathedral. An ecclesiastical commentator, complaining about the funding decision, declared that it was not desirable to rob St. Peter's altar in order to build one to St. Paul, soon popularized as robbing Peter to pay Paul. (Brewer, Dict. of Phrase and Fable (1898) <http://www.bartleby.com/81/14383.html> [as of Nov. 9, 2000].)

taxation is limited only by constitutional restrictions." [Citation.] In other words, the Legislature's authority to impose taxes and regulate the collection thereof exists unless it has been *expressly* eliminated by the Constitution. [Citations.]' " (*Sasaki, supra,* 23 Cal.App.4th at pp. 1453-1454, citing *Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 624 [194 Cal.Rptr. 294].)

When considering the Legislature's considerable powers regarding budget and tax matters, "the Legislature, not this court, decides which of the innumerable public mouths tax revenues will feed. Barring a statutory or constitutional violation, it is not for this court to stop the Legislature if it transfers revenue from Peter to compensate Paul . . . ." (*Arcadia Redevelopment Agency v. Ikemoto* (1993) 16 Cal.App.4th 444, 453 [20 Cal.Rptr.2d 112] (*Arcadia*).) "Under these principles, there is no basis for applying section 6 as an equitable remedy to cure the perceived unfairness resulting from political decisions on funding priorities." (*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1817 [53 Cal.Rptr.2d 521] (*City of San Jose*).)

Allocation of local property tax revenues is an appropriate exercise of the Legislature's authority regarding taxes. In *Amador Valley, supra,* 22 Cal.3d 208, the court upheld Proposition 13 and the vesting in the Legislature of the general power to allocate revenues from local property taxes. (22 Cal.3d at pp. 225-226.) The court noted that the Legislature was not thereby empowered to reward or punish local agencies and thereby undermine local power to address regional issues by withholding funds. The court explained that Proposition 13 did not empower the state to "direct or control local budgetary decisions or program or service priorities . . ." or otherwise interfere with local decisionmaking. (22 Cal.3d at p. 226.) However, the *Amador Valley* court specifically stated that legislation that merely allocates funds on a pro rata basis, without imposing *conditions* on the local entity's use of the funds is a valid exercise of the state's authority under Proposition 13. (22 Cal.3d at p. 227.)

Courts have upheld the Legislature's specific power to reduce a county's allocated share of property taxes. In *Sasaki,* the court reviewed the same legislation that is the basis of the claim for subvention in this appeal. The court traced the history of education funding from *Serrano* through the post-Proposition 13 legislation, noting that the Legislature's bailout of counties and distribution of the remaining tax revenues was upheld in *Amador Valley.* (*Sasaki, supra,* 23 Cal.App.4th at pp. 1450-1452.) The *Sasaki* court recognized that in the wake of Proposition 13, the state assumed a larger

share of the funding of schools, but found no intent to prevent the state from altering the proportionate shares of revenue to address future changed conditions. (*Sasaki, supra,* 23 Cal.App.4th at p. 1456.) The fact that the state shifted revenue away from the schools and towards local government after Proposition 13 did not restrict the state's power to change the allocation again, "in the context of comprehensive legislative planning for the funding of both entities from a variety of sources, including property tax revenue." (*Sasaki, supra,* 23 Cal.App.4th at p. 1457.)

When acting to allocate taxes among various entities, the Legislature is acting within its particular sphere of power and discretion. Constitutional provisions will not be extended by implication to curtail the proper exercise of that power. Keeping these principles in mind, we turn to an analysis of the requirements of section 6 to determine whether the challenged allocation of property tax revenues necessitates subvention to the Counties.

*Section 6 Subvention Is Intended for Increases in Actual Costs*

■ In the November 1979 election, the voters passed Proposition 4, which included section 6, and was intended as a complementary measure to Proposition 13. Designated "the Spirit of 13," the initiative provided for a constitutional limitation on government spending. (Ballot Pamp., Special Statewide Elec. (Nov. 6, 1979) p. 18.) As incorporated in California Constitution, article XIII B, Proposition 4 was intended to "require state and local governments to limit their budgets . . . ." (Ballot Pamp., Special Statewide Elec., *supra*, p. 18; *County of San Diego, supra,* 15 Cal.4th at p. 81.) In addition, voters were told that section 6 of Proposition 4 was intended to prevent state government attempts "to force programs on local governments without the state paying for them." (Ballot Pamp., Special Statewide Elec., *supra*, p. 18.)

Section 6 provides: "Whenever the Legislature . . . mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ."[16] As noted in *Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830 [244 Cal.Rptr. 677, 750 P.2d 318] (*Lucia Mar*), the principle of reimbursement was "enshrined in the Constitution . . . to provide local entities with the assurance that state mandates would not place additional burdens on their increasingly limited revenue resources." (*Id.* at p. 836, fn. 6.)

---

[16]Proposition 4 excepted mandates enacted prior to January 1, 1975, from the subvention provision. (Cal. Const., art. XIII B, § 6, subd. (c).)

■ Analysis of a section 6 reimbursement claim includes an assessment of the language of the constitutional provision, including the explicit requirements of "costs" of a "new program or higher level of service" as well as the purpose of the voters in seeking to prevent new, unfunded mandates in light of the spending limits of California Constitution, article XIII B. (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56 [233 Cal.Rptr. 38, 729 P.2d 202] (*County of Los Angeles*).) Section 6 does not provide subvention for every increased cost mandated by state law. (*Lucia Mar, supra,* 44 Cal.3d at p. 835.) The court in *County of Los Angeles* confirmed that the voters had not intended that all local costs resulting from compliance with state law would be reimbursable, but intended to prevent: "the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public." (*County of Los Angeles, supra,* 43 Cal.3d at p. 56.)

■ The trial court determined that section 6 does not require an actual expenditure of funds as a prerequisite to reimbursement. The court indicated that *Lucia Mar, supra,* 44 Cal.3d 830, and *County of San Diego, supra,* 15 Cal.4th 68, held that no actual cost need be shown if the state has in fact shifted a financial burden to local government. However, the court failed to note that in both *Lucia Mar* and *County of San Diego*, the shift of responsibility to local government resulted in actual expenditures by those entities. In *Lucia Mar*, for example, the state attempted to collect the actual dollar amounts claimed for use of the state schools from the local districts by sending invoices to the schools. (*Lucia Mar, supra,* 44 Cal.3d at pp. 832-833.) Similarly, in *County of San Diego, supra,* 15 Cal.4th 68, the county had to expend funds to provide health care services for a population formerly served solely by the state. San Diego County had a direct and ascertainable cost resulting from the state's action. (*Id.* at pp. 79-80.)

In this case, the County's tax revenues were not expended. No invoices were sent, no costs were collected, and no charges were made against the counties in this case. Contrary to the conclusion of the trial court, it is the expenditure of tax revenues of local governments that is the appropriate focus of section 6. (*County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487 [280 Cal.Rptr. 92, 808 P.2d 235] (*County of Fresno*) [stating that § 6 was "designed to protect the tax revenues of local governments from state mandates that would require expenditure of such revenues."].)

An examination of the intent of the voters and the language of Proposition 4 itself supports our conclusion that Proposition 4 was aimed at controlling

and capping government spending, not curbing changes in revenue allocations. Section 6 is an obvious compliment to the goal of Proposition 4 in that it prevents the state from forcing extra programs on local governments in a manner that negates their careful budgeting of expenditures. A forced program that would negate such planning is one that results in increased actual expenditures of limited tax proceeds that are counted against the local government's spending limit. Section 6, located within a measure aimed at limiting expenditures, is expressly concerned with "costs" incurred by local government as a result of state-mandated programs, particularly when the costs of compliance with a new program restrict local spending in other areas. (§ 6.) "No state duty of subvention is triggered where the local agency is not required to expend its proceeds of taxes." (*Redevelopment Agency v. Commission on State Mandates* (1997) 55 Cal.App.4th 976, 987 [64 Cal.Rptr.2d 270] [Cal. Const., art. XIII B intended to limit spending of the proceeds from taxes].)

Aside from the implications to be drawn from the location of section 6 within the spending limitations of Proposition 4, the Legislature has interpreted California Constitution, article XIII B in subsequent statutes. ▮ Where a constitutional provision may have different meanings, " '. . . "it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling." . . .' " (*Arcadia, supra,* 16 Cal.App.4th at p. 452.)

▮ Government Code sections 17500 through 17630 were enacted by the Legislature to implement section 6. (*County of Fresno, supra,* 53 Cal.3d at p. 484.) Government Code section 17514 defines "costs mandated by the state" for purposes of section 6 as "any increased costs which a local agency or school district is *required to incur* after July 1, 1980, as a result of any statute . . . which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution." (Italics added.) Government Code section 17522 defines "annual reimbursement claim" to mean "a claim for *actual costs incurred* . . . ." (Italics added.) Similarly, Government Code section 17558.5 refers to a claim for "*actual costs* filed by a local agency . . . ." (Italics added.) The obvious view of the Legislature is that reimbursement is intended to replace actual costs incurred, not as compensation for revenue that was never received. The Legislature's view is entitled to significant weight. (*Arcadia, supra,* 16 Cal.App.4th at pp. 452-453.)

The County argues that if an actual cost is required for subvention, the reduced allocation of tax revenues challenged here should be considered

such a cost. But, as noted by the Commission in its brief in support of appellant, when reimbursement for lost revenues is intended by the Constitution, it is clearly expressed. For example article XIII, section 8.5 of the California Constitution regarding postponement of property taxes provides for subvention to local government in "an amount equal to the amount of revenue lost by each by reason of the postponement of taxes . . . ." Section 25 of article XIII of the California Constitution, regarding the homeowners property tax exemption, provides for reimbursement to local government "for revenue lost because of Section 3(k)." The presence of these references to reimbursement for lost revenue in article XIII supports a conclusion that by using the word "cost" in section 6 the voters meant the common meaning of cost as an expenditure or expense actually incurred.

In light of the constraints imposed by the rules regarding strict construction of constitutional limitations on the power of the Legislature, and the rule that requires respect for the Legislature's adoption of a particular meaning of a constitutional phrase, we cannot extend the provisions of section 6 to include concepts such as lost revenue, that are not fairly implicated by the history, voter materials, language and legislative interpretation of section 6. We can only conclude that when the Constitution uses "costs" in the context of subvention of funds to reimburse for "the costs of such program," that some actual cost must be demonstrated, and not merely decreases in revenue.[17]

*Subvention Cases Involve Programs Previously Funded Exclusively by the State*

The trial court stated that *Lucia Mar, supra,* 44 Cal.3d 830, and *County of San Diego, supra,* 15 Cal.4th 68, held that whenever a state shifts a burden to local government, it has established a new program or higher level of service for purposes of subvention. The trial court believed that so long as the local entity could demonstrate a financial burden had been shifted, subvention was necessary irrespective of actual costs or prior funding of the program. Like the trial court, the Counties insist that *Lucia Mar* and *County of San Diego* involve striking similarities to this case and establish that any shift in funding is a new program for purposes of subvention. But there is a critical difference, aside from the issue of actual costs expended, between the facts of *Lucia Mar* and *County of San Diego,* and this case. The programs at issue in the cited cases were entirely funded by the state at the time section 6 became effective.

---

[17]We are not alone in this conclusion. In *City of El Monte, supra,* 83 Cal.App.4th 266, the court rejected a similar claim for subvention brought by a special district, finding that allocating revenues among local entities did not amount to a reimbursable state mandate.

The County argues that *Lucia Mar* involved a situation in which the state attempted to return to local school districts the cost of educating students at special state schools, a cost the state assumed after Proposition 13. However, any apparent similarity to the reallocation brought about by the ERAF legislation is only superficial. *Lucia Mar* concerned a statute that required a school district to pay part of the cost of educating students from the local district at a state school for the severely handicapped. By July 1, 1980 (the date that § 6 became effective), the state had already assumed the entire responsibility for funding of the state school program. The *Lucia Mar* court found that it violated the purpose of section 6 to compel local governments to "accept financial responsibility in whole or in part for a program which was *funded entirely by the state* before the advent of article XIIIB . . . ." (*Lucia Mar, supra,* 44 Cal.3d at p. 836, italics added.) Thus, the facts of *Lucia Mar* involved the transfer of costs from a totally state-funded program to the local governmental entities.

*County of San Diego, supra,* 15 Cal.4th 68, said by the Counties to extend *Lucia Mar* to a de facto shift of financial responsibility, involved the care of medically indigent persons (MIP) who were not linked to a federal category of disability, but only lacked the income and resources to afford health care. (*Id.* at p. 77.) In 1971, the state extended Medi-Cal coverage to these individuals. At the time the voters adopted section 6, the state provided health care funding for MIP's without any financial contribution from the counties. In 1983 the state excluded those individuals from the Medi-Cal program. (15 Cal.4th at p. 98.) An existing statute made the counties responsible for treating indigent persons who did not qualify for other aid. (*Id.* at p. 92.) The result of the state's exclusion of the MIP population from Medi-Cal was that their care fell to the counties as providers of last resort under the statute.

The opening paragraph of Justice Chin's opinion in *County of San Diego* expresses this critical part of the holding. "[W]hen the electorate adopted section 6, the state provided Medi-Cal coverage to these medically indigent *adults without requiring financial contributions from counties.*" (*County of San Diego, supra,* 15 Cal.4th at p. 75, italics added.) This point was amplified in a response to the dissent. "We do not hold that 'whenever there is a change in a state program that has the effect of increasing a county's financial burden . . . there must be reimbursement by the state.' . . . Rather, we hold that section 6 prohibits the state from shifting to counties the costs of state programs for which the state assumed *complete financial responsibility before adoption of section 6.*" (*Id.* at p. 99, fn. 20, italics added.)

The Counties have ignored the key point in both *Lucia Mar* and *County of San Diego*, that in both cases, the state shifted some part of its sole financial responsibility to the local entity. The forced acceptance of that new financial cost implicates section 6. Neither *Lucia Mar* nor *County of San Diego* held that subvention would be required for a change in allocation of the percentage of responsibility for a program that has always been jointly funded by state and local governments. The unifying concept in those cases was the transfer of actual costs of a program that had been entirely funded by the state at the time section 6 went into effect.

In this case, on July 1, 1980, the funding of education in California was still a joint endeavor between the state and local governments, subject to changing allocations of responsibility. "The system of public school support should effect a partnership between the state, the county, and school districts, with each participating equitably in accordance with its relative ability." (Ed. Code, § 14000.) The financing of public schools in California has been, and remains, a complex and sometimes convoluted system of joint responsibility between state and local government. (*Butt v. State of California, supra,* 4 Cal.4th 668, 679, fn. 11 [describing the Legislature's complex financing scheme utilizing local property tax revenues and state equalizing payments]; *Hayes, supra,* 5 Cal.App.4th at p. 1525.)[18] Funding for education had not been, and never was fully assumed by the state. As expressed by the court in *Sasaki, supra,* 23 Cal.App.4th 1442, 1457, "there is a historical fluidity in the fiscal relationship between local governments and schools. The state has shifted property tax revenue both from schools to local governments, and, as in this case, from local governments to schools. These shifts, including the one presently complained of, have been made in the context of comprehensive legislative planning for the funding of both entities from a variety of sources, including property tax revenue."

Unlike the *Lucia Mar* and *County of San Diego* cases, there is no shift in this case from a totally state-supported status to a forced sharing on the part of local government. The state has not imposed responsibility for any program that local governments have not always had a substantial share in supporting. (Accord, *City of El Monte, supra,* 83 Cal.App.4th 266 [*Lucia Mar* involved program expenses entirely borne by state].)

The County argues that a number of subvention cases support its contention that the "bedrock" of analysis of any section 6 claim is only whether there was a shift of financial responsibility to local government. However,

---

[18]"Fewer still would deny that financing the public educational system in this state is Byzantine in its intricacy and complexity." (*Hayes, supra,* 5 Cal.App.4th at p. 1525.)

those other subvention cases, which we discuss next, do not address the issues raised in this case as clearly as *Lucia Mar* and *County of San Diego.* Nothing in those cases focuses on a shift of responsibility alone as the keystone of subvention analysis. Rather, the cited cases have turned on other factors. None of the cases found subvention appropriate where the state had not required a local entity to assume financial responsibility for a formerly state funded program. No case holds that changes in the allocation of budgetary amounts to local entities must be offset by subvention.

The other cases regarding reimbursement do not turn on the existence of a shift in only a portion of a jointly funded program. In *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155 [275 Cal.Rptr. 449], the school district sought reimbursement for the cost of developing desegregation programs. (*Id.* at pp. 164-165.) The court required a specific state mandated action to trigger subvention. The court stated that a mere increase in the cost of providing a service does not trigger reimbursement. (*Id.* at p. 173.) Similarly, in *Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564 [15 Cal.Rptr.2d 547], school districts sought reimbursement for the cost of providing due process hearings in connection with state mandated special education evaluation programs that the districts argued exceeded costs necessitated by federal requirements. (11 Cal.App.4th at p. 1574.) The court determined that a federal mandate would not require state subvention, except "[t]o the extent the state implemented the [federal] act by freely choosing to impose new programs . . . ." (*Id.* at pp. 1593- 1594.) In *Redevelopment Agency v. Commission on State Mandates, supra,* 55 Cal.App.4th 976, subvention was not appropriate because the financing received by the agency was deemed exempt from section 6. That court also noted that the state was not transferring a program for which it was "formerly legally and financially responsible."[19] (*Redevelopment Agency, supra,* 55 Cal.App.4th at pp. 986-987.)

---

[19]Cases that rejected claims of reimbursement similarly did not focus on shifting allocations in joint programs. In *City of Sacramento, supra,* 50 Cal.3d 51, the court merely determined that legislation extending unemployment insurance coverage to local government employees was not unique to local government and did not come within section 6. Similarly, in *County of Los Angeles, supra,* 43 Cal.3d 46, the court found that extension of workers' compensation benefits to government employees was not unique to government and not covered by section 6. In *County of Fresno, supra,* 53 Cal.3d 482, the court stated that reimbursement is not required where a local agency has authority to levy assessments sufficient to pay for the program. *City of San Jose, supra,* 45 Cal.App.4th 1802 involved a city's claim for reimbursement for fees charged by counties for booking city arrestees into county jail. If anything, this case supports the Commission's decision because reimbursement was refused for an allocation among the counties, rather than for a state funded program. (*Id.* at p. 1812; see also *City of El Monte, supra,* 83 Cal.App.4th 266 [*City of San Jose* denied subvention for shifting of funds among local entities].)

We do not find a single case, statute, or administrative ruling that indicates the shifting of percentage allocations of financial responsibility for joint state and locally funded programs requires reimbursement to the local government whenever it receives less money than it did in the previous budget year. The critical point in the analysis is that school funding in California was, at the time section 6 became effective, a jointly funded partnership between the state and local governments. These joint budget allocations are not subject to section 6. To hold otherwise would impermissibly cripple the ability of the Legislature to function in the critical area of budget planning.

*Proposition 98 Confers No Right of Subvention on the County*

■   An important premise of the County's argument is that Proposition 98 imposes a requirement that the state may use only funds from the state's General Fund to satisfy the minimum level of school finance. According to the County, if the state uses any other type of funding to satisfy the minimum amount, it must repay whatever source was used. It is this claimed impermissible use of the revenue not allocated to the County that supports the claim of subvention in this case. The County argues that it can trace the state's use of the unallocated revenue, through the provisions of Education Code section 41204.5, to a reduction in the Proposition 98 minimum funding amounts, which proves the County's claim that it was mandated to assume the cost of a program that was previously solely funded by the state.[20] The reality is that the County has no claim to revenues it never received and has no basis for challenging the state's methods of allocating funds to other entities.

Proposition 98, adopted by the voters in 1988, amended article XVI, section 8 of the California Constitution to provide a minimum level of funding for schools. (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) p. 78.) The measure, supported by the California Teachers Association and the state Parent-Teacher Association, set up two tests, later expanded by the passage of Proposition 111 in 1990 to three tests, for determining the mandated minimum funding level for the coming year. (*Hayes, supra,* 5 Cal.App.4th at

---

[20]Education Code section 41204.5 deems the words "percentage of General Fund revenues appropriated for school districts . . . in fiscal year 1986-87" for purposes of the first test of Proposition 98's minimum funding provisions to be calculated as though the ERAF legislation had been in effect in the 1986-1987 fiscal year. This provision has the consequence of decreasing the amount the state contributes towards the minimum school funding guarantee.

p. 1519, fn. 2.)[21] The first formula uses a percentage of General Fund revenues appropriated to schools in fiscal year 1986-1987. The second and third formulas use a measure that includes both General Fund revenues and "allocated local proceeds of taxes." (Cal. Const., art. XVI, § 8, subd. (b).)

In arguing that Proposition 98 establishes a wholly state-funded program that they have been forced to finance, the Counties misconstrue the impact of Proposition 98. Proposition 98 did not alter the state's role in education. (*Hayes, supra,* 5 Cal.App.4th at p. 1533.) Proposition 98 does not appropriate funds nor does it result in some mandated county program or higher level of service that the Counties had not previously supported through property tax allocations. The power to appropriate funds was left in the hands of the Legislature. Proposition 98 merely provides the formulas for determining the minimum to be appropriated every budget year. The state's obligation is to ensure specific amounts of moneys are applied by the state for education. Budgetary decisions that allocate funds to various agencies of the state or political subdivisions cannot be placed in the category of mandates that require subvention. Such decisions, of necessity, impact different agencies of the state or political subdivisions, with some getting more funds as others get less. Sometimes Peter receives more than Paul. We perceive no intent in Proposition 98's concern for an appropriate level of funding for education that would tie the hands of the Legislature in meeting that goal, particularly in years of low revenues.

Furthermore, local governments do not have a claim to a specified portion of the budget in each budget year. We recognize that the trial court found

---

[21]Section 8 of article XVI provides the following three tests: "(b) Commencing with the 1990-91 fiscal year, the moneys to be applied by the State for the support of school districts and community college districts shall be not less than the greater of the following amounts: [¶] (1) The amount which, as a percentage of General Fund revenues which may be appropriated pursuant to Article XIII B, equals the percentage of General Fund revenues appropriated for school districts and community college districts, respectively, in fiscal year 1986-87. [¶] (2) The amount required to ensure that the total allocations to school districts and community college districts from General Fund proceeds of taxes appropriated pursuant to Article XIII B and allocated local proceeds of taxes shall not be less than the total amount from these sources in the prior fiscal year, excluding any revenues allocated pursuant to subdivision (a) of Section 8.5, adjusted for changes in enrollment and adjusted for the change in the cost of living pursuant to paragraph (1) of subdivision (e) of Section 8 of Article XIII B. This paragraph shall be operative only in a fiscal year in which the percentage growth in California per capita personal income is less than or equal to the percentage growth in per capita General Fund revenues plus one half of one percent. [¶] (3)(A) The amount required to ensure that the total allocations to school districts and community college districts from General Fund proceeds of taxes appropriated pursuant to Article XIII B and allocated local proceeds of taxes shall equal the total amount from these sources in the prior fiscal year, excluding any revenues allocated pursuant to subdivision (a) of Section 8.5, adjusted for changes in enrollment and adjusted for the change in per capita General Fund revenues." (Cal. Const., art. XVI, § 8, subd. (b).)

that the County had not asserted a claim of entitlement, but the belief in such an entitlement is a necessary foundation for the claim for subvention. The County's case, stripped to its core complaint, is that the County's revenue decreased in the challenged years, not that the Legislature found a different way to meet the Proposition 98 funding requirements for schools. Absent some entitlement to the claimed revenues, the County cannot prevail in this action for reimbursement.

As noted by the court in *San Miguel, supra,* 25 Cal.App.4th 134, the plaintiffs there had "no 'vested right' to receive property tax revenues [citation] and no 'property interest' in such revenues [citation] because 'as against the state, the county [or district] has no ultimate interest in the property under its care.' [Citation.]" (*Id.* at p. 143, italics omitted.) The County in this case argues that *San Miguel* was based on an erroneous historical analysis. The County notes that *San Miguel* relied on *Conlin v. Board of Supervisors* (1893) 99 Cal. 17 [33 P. 753], which predated a 1910 amendment to the Constitution. This reliance, the County contends, reveals the mistaken analysis of the *San Miguel* court because the 1910 amendment to the Constitution provided for strict separation of state and local revenue. Aside from the fact that one accepted purpose of Proposition 13 was to establish state, as opposed to local, control over local property taxes, the *San Miguel* court relied on cases as recent as *Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286 [268 Cal.Rptr. 219], which also made it clear that "as against the state, the County has no 'property' interest in its revenues. '[A]ll property under the care and control of a county is merely held in trust by the county for the people of the entire state." (*Id.* at p. 297, italics omitted [county may not challenge state's aid to families with dependent children funding statute requiring county to contribute to state program].) In *Marin Hospital Dist. v. Rothman* (1983) 139 Cal.App.3d 495 [188 Cal.Rptr. 828], this court rejected an argument that a local agency had a vested right to receive tax revenues. (*Id.* at pp. 501-502.) We agree with the *San Miguel* court that political subdivisions of the state have no basis for challenging revenue allocations to another agency and no right to receive a particular allocation of tax revenues themselves.

We also note that even if the Counties prevailed on this argument and the Legislature's reduction of the General Fund component of the guaranteed minimum financing to schools was invalidated, the Counties would not receive any payment as a result. The only consequence of invalidation of the change in the state's General Fund payment would be that the state would be required to pay more to schools in the challenged years, not that a portion of the school's revenue allocation would be revoked and paid to the Counties.

This outcome highlights the reality that the Counties have no legally cognizable interest that would entitle them to challenge the Legislature's manner of funding education. The inclusion of a discussion of Proposition 98 and minimum funding for schools serves only to confuse the issues properly raised in this appeal from a decision ordering subvention for a reduction in revenues.

It is clear from the trial court's opinion that the injection of the Proposition 98 issues into the case obscured the real issues and distorted the outcome below. For example, the trial court framed the issue as being whether "the state can use property taxes to fulfill its obligation to provide funding for schools from the state general fund." As discussed, local governments have no interest in invalidating state funding allocations to schools. From this mistaken hypothesis, the court made the erroneous determination that because funding a portion of the school budget is solely the state's responsibility, a change in the source of the funding of that portion of the school program implicated principles of subvention.

In its review of the County's claim, the Commission properly focused its inquiry, in conformance with the appropriate narrow construction given to limitations on the Legislature's taxing powers, on whether the reduction in revenues caused by the ERAF legislation required the Counties to expend tax revenues in support of a state program. (*City of El Monte, supra,* 83 Cal.App.4th 266 [Prop. 98 not properly before court on subvention appeal].)

Understanding that the argument of the Counties is at once too narrow and too broad is critical to reaching a correct result in light of the need for a narrow construction of limitations on the state's power to allocate tax revenues. The Counties' argument is too narrow in that it focuses on one aspect of school finance—the minimum funding of Proposition 98—to claim that education is solely a state funded program. The Counties ignore the larger picture that education is and always has been a jointly funded program. The argument is too broad because it encompasses the whole of the budget process for the questioned years in a misguided attempt to trace the decreased revenues to some impermissible use, rather than focusing on the decrease in revenue to the County. In fact, the Counties never received the disputed revenue, and the Counties have no standing to challenge budget allocations to other entities. The Commission properly limited its review of the subvention claim to the decreased allocation of revenue that resulted from the ERAF legislation.

*Home Rule Has Not Been Abolished*

■    Returning to an argument considered and rejected in *Amador Valley, supra,* 22 Cal.3d 208, *City of Rancho Cucamonga v. Mackzum* (1991) 228

Cal.App.3d 929 [46 Cal.Rptr.2d 448], and *Sasaki, supra,* 23 Cal.App.4th 1442, the County contends that the Legislature's decrease of its property tax revenues violates principles of home rule.[22] As all of the referenced cases have concluded, from the time of Proposition 13 to the present, home rule has been limited, but not extinguished. As previously noted, this appeal is solely from a subvention decision and does not properly place before us a challenge to the validity of the state's actions. Although the issue of reallocation of local property tax revenues and home rule has been definitively discussed in prior cases, we again note them in response to the County's and amici curiae's repeated raising of this argument.

The principle of home rule refers to a local government's power to control and finance its own local affairs. (*Amador Valley, supra,* 22 Cal.3d at pp. 224-225.) In *Amador,* the court upheld Proposition 13 against a claimed impairment of home rule. The court recognized that a limitation on the ability to levy taxes had a limiting effect on home rule, but stated that nothing in the proposition abrogates home rule "or discloses any intent to undermine or subordinate preexisting constitutional provisions on that subject . . . ." (22 Cal.3d at p. 225.) The key reason that the court found that home rule was not improperly infringed was that the funds at issue in that case were allocated to local agencies on a pro rata basis, "without imposing any condition whatever regarding their ultimate use." (*Id.* at p. 227.)

In *City of Rancho Cucamonga v. Mackzum, supra,* 228 Cal.App.3d 929, the court recognized that "the purpose of Proposition 13 itself was to achieve statewide control over escalating local property tax rates." (*Id.* at p. 945.) The court determined that Proposition 13 was a grant of authority to the · Legislature to act in an area of statewide concern, and therefore, controlled over the home rule taxing power of charter cities. (228 Cal.App.3d at p. 945.) The court concluded that although the home rule power was limited, it was not repealed.

When considering the same objection in relation to the ERAF legislation that supports the claim in this appeal, the court in *Sasaki, supra,* 23 Cal.App.4th 1442, found that shifting property tax revenues away from local governments did not result in impermissible infringement on the home rule powers. (*Id.* at p. 1457.) Neither the record in this case nor the ERAF legislation suggests that the Legislature has infringed upon the County's discretionary affairs so as to interfere with the rights of local residents to home rule. We agree with the analysis of the foregoing cases and reject the

---

[22]The Counties referenced home rule, while the amicus curiae brief submitted by numerous California cities expanded on the origins and nature of home rule.

County's attempt to interpose home rule as a bar to budget allocation decisions.

## CONCLUSION

The state is not obligated to reimburse local governments for the challenged change in allocation of property tax revenues among local entities. The reallocation of revenue resulting from the challenged legislation imposes no reimbursable cost on local governments and is neither a "new program" nor a "higher level of service" within the meaning of the Constitution. The Legislature is the proper forum to address those perceived inequities and to seek fiscal relief. The judgment of the superior court is reversed and remanded with instructions to enter a new judgment denying the petition for writ of mandate. In the interests of justice each party should bear its own costs on appeal.

Strankman, P. J., and Swager, J., concurred.

A petition for a rehearing was denied December 19, 2000, and the opinion was modified to read as printed above. The petition of plaintiff and respondent and interveners and respondents for review by the Supreme Court was denied February 28, 2001. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.