[No. B077722. Second Dist., Div. Three. Mar. 30, 1994.]

COUNTY OF LOS ANGELES, Plaintiff and Appellant, v.
ALAN T. SASAKI, as Auditor-Controller, etc., Defendant and
Respondent;
ANTHONY L. MILLER, as Acting Secretary of State, etc., et al., Real
Parties in Interest and Respondents.

COUNSEL

De Witt W. Clinton, County Counsel, and Frederick R. Bennett, Assistant County Counsel, for Plaintiff and Appellant.

Leland C. Dolley, City Attorney (Alhambra), Jerold A. Goddard, City Attorney (Redondo Beach), Burke, Williams & Sorensen, J. Robert Flandrick, Robert V. Wadden, Jr., Timothy D. Cremin, Cameron L. Reeves, County Counsel (Lake), Anita L. Grant, Deputy County Counsel, David Nawi, County Counsel (Santa Barbara) and Kevin E. Ready, Sr., Deputy County Counsel, as Amici Curiae on behalf of Plaintiffs and Appellants.

Rodi, Pollock, Pettker, Galbraith & Phillips, John D. Cahill and Cris K. O'Neall for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Allen Sumner and N. Eugene Hill, Assistant Attorneys General, Linda Cabatic, Daniel G. Stone, Damon Connolly and Christopher Foley, Deputy Attorneys General, for Real Parties in Interest and Respondents.

Christian M. Keiner, J. Stanton Bair, Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen and Karen A. Getman as Amici Curiae on behalf of Real Parties in Interest and Respondents.

Lloyd M. Harmon, Jr., County Counsel (San Diego) and Theresa Osterman Stevenson as Amici Curiae.

OPINION

KITCHING, J.—The County of Los Angeles (the County) appeals the judgment denying its petition for writ of mandate to compel County Auditor-Controller Alan T. Sasaki (Sasaki) to disburse property tax receipts in accordance with County Ordinance No. 93-0045. That ordinance provides for apportionment of property tax revenues for fiscal year 1993-1994 in accordance with their apportionment in 1992-1993, rather than pursuant to state Senate Bill No. 1135 (SB 1135). SB 1135, effective June 30, 1993, reallocates approximately $2.6 billion in local property tax revenues for fiscal year 1993-1994 from local governments and special districts to school districts and community college districts.[1]

---

[1] Amici curiae briefs in support of the County's position have been filed by the counties of Santa Barbara, Imperial, Sonoma, Plumas, Madera, San Joaquin, Nevada, and the Lake, and

## INTRODUCTION

The County challenges what it characterizes as the state plan for a permanent restructuring of the fiscal relationship between state and local government. According to the County, this plan contemplates a shift in the burden of financing education from the state to the counties. The County asserts the plan encompasses a reallocation by the state of local property tax revenues from local governments and special districts to education pursuant to SB 1135. The County also contends the plan includes a redefinition pursuant to Senate Bill No. 399 (SB 399), also effective June 30, 1993, of the formulas set forth in Propositions 98 and 111 (Proposition 98) for determining the state's responsibility for educational funding.

The County argues this plan is unconstitutional because article XIII, section 24 of the state Constitution precludes the use of local property taxes for state purposes, in this case, to fulfill what the County asserts is the state's educational responsibility. The County also contends SB 1135 violates the "home rule" provisions of the state Constitution (Cal. Const., art XI, §§ 4, 5).

We determine the County not only lacks standing to challenge the constitutionality of SB 399, but also waived its challenge by voluntarily dismissing its cause of action for declaratory relief, and failing to provide a factual record upon which the challenge could be based.

We conclude the County has not established that the reallocation of property tax revenue from local governments to schools mandated by the Legislature in SB 1135 violates the home rule provisions of the California Constitution. We also hold SB 1135 does not violate article XIII, section 24 of the California Constitution.

Finally, we determine County Ordinance No. 93-00454 is void in any event because it not only conflicts with the general law of the state (SB 1135), but the County may not legislate in the area of property tax allocation because the state has occupied the field.

The judgment will be affirmed.

---

the cities of Alhambra and Redondo Beach. Amici curiae briefs in support of the position of state officials who are real parties in interest have been filed by the California Teachers Association, and the California School Boards Association Education Legal Alliance. In addition, the County of San Diego has filed an amicus curiae letter brief requesting that this court limit its ruling. Responses to this letter brief were filed by several of the real parties in interest who agree with the position of the County of San Diego, and the County of Los Angeles which disagrees with that position.

FACTUAL AND PROCEDURAL BACKGROUND

## 1. *SB 1135*

SB 1135 was enacted by urgency legislation implementing the 1993-1994 Budget Act. (Stats. 1993, ch. 68, eff. June 30, 1993.) Among other things, the statute added sections 97.02 and 97.035 to the Revenue and Taxation Code. For the fiscal year 1993-1994, these sections reallocate approximately $2.6 billion of property tax revenues from counties, cities and counties, cities, and special districts, to educational revenue augmentation funds established in each county or city and county for distribution to school districts, county offices of education, and community college districts.

The reallocation is computed by the Department of Finance on a county-by-county basis pursuant to a formula based on a combination of the proportion of total Proposition 13 bailout assistance received by the County (Rev. & Tax. Code, § 97.035, subd. (a)(2)(A)), and the County's proportionate share of total statewide sales taxes (*id.*, § 97.035, subd. (a)(2)(B)).

As a result of these measures, the share of property tax revenues allocated to K-14 schools increased from the 35 percent share the schools received in 1991-1992, to 55 percent in 1993-1994. This is, however, just 2 percent more than the schools were allocated for fiscal year 1977-1978. (Governor's Budget Summary 1993-94, p. 43.)

## 2. *SB 399*

SB 399 was also enacted as an urgency measure effective June 30, 1993. Among other things, SB 399 added section 41204.5 to the Education Code. This section affects the formulas set forth in article XVI, section 8 of the California Constitution, as amended by Proposition 98, adopted by the electorate in November 1988, and Proposition 111, operative July 1, 1990, for determining "the moneys to be applied by the state for the support of school districts and community college districts." (Art. XVI, § 8, subd. (b).)

Subdivision (b) of section 8 of article XVI provides the moneys to be so applied "shall be not less than the greater" of the amounts determined by application of three formulas. The first of these formulas is "[t]he amount which, as a percentage of General Fund revenues which may be appropriated pursuant to Article XIII B, equals the percentage of General Fund revenues appropriated for school districts and community college districts, respectively, in fiscal year 1986-87." (Art. XVI, § 8, subd. (b)(1).)

Education Code section 41204.5 provides, in subdivision (c), that "for the 1993-94 fiscal year and each year thereafter, the percentage of 'General

Fund revenues appropriated for school districts and community college districts, respectively, in fiscal year 1986-87,' for purposes of paragraph (1) of subdivision (b) of Section 8 of Article XVI of the California Constitution, shall be deemed to be the percentage of General Fund revenues that would have been appropriated for those entities if the amendments made to Chapter 6 (commencing with Section 95) of Part 0.5 of the Revenue and Taxation Code by statutes enacted during the 1991-92 Regular Session and the amendments made to that chapter by statutes enacted during the 1993-94 Regular Session having the effect that property tax revenues are shifted from one or more counties, cities, or special districts to one or more school districts or community college districts, had been operative for the 1986-87 fiscal year."

### 3. *County Ordinance No. 93-0045*

Anticipating the foregoing legislative enactments, the County enacted Ordinance No. 93-0045, which added chapter 4.200, entitled "Apportionment of Property Taxes," to the County Code. This ordinance, which became operative upon the state's enactment of SB 1135, directs the County Treasurer-Tax Collector and Auditor-Controller to collect, apportion and disburse property taxes for fiscal year 1993-1994 in accordance with the apportionment provided by law in fiscal year 1992-1993. In other words, the responsible County officers were directed by the County to ignore the state directive set forth in SB 1135.

### 4. *The County's Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate*

Thereafter, the County filed a complaint and petition against Sasaki, naming as real parties in interest the Secretary of State, State Controller, State Treasurer, Director of the Department of Finance, Governor, Assembly Speaker, and President Pro Tempore of the State Senate. The complaint sought an injunction precluding enforcement of SB 1135 with regard to locally imposed and collected property taxes, a writ of mandate directing Sasaki to disburse such revenues in accordance with the County ordinance, and a declaration that SB 1135 unconstitutionally confiscates approximately $2.6 billion of such revenues and unconstitutionally uses the funds to pay a substantial part of the state's portion of school funding, or to pay other state expenses in violation of the "home rule" responsibilities of local chartered governments and in violation of Proposition 98 and of articles XIII A; XIII B; and XIII, section 24, of the California Constitution.

The trial court issued an alternative writ of mandate on July 13, 1993. The matter was heard on July 28, 1993, and judgment was entered the same day

dismissing the real parties in interest who are state legislators (Cal. Const., art. IV, § 14; *Harmer* v. *Superior Court* (1969) 275 Cal.App.2d 345 [79 Cal.Rptr. 855]), denying the petition for writ of mandate, and dismissing the causes of action for declaratory and injunctive relief pursuant to the County's request.

## Scope of the Appeal

■ Without mentioning SB 399, the County alleged in its complaint that the state will use the funds reallocated pursuant to SB 1135 to fulfill its responsibilities for the financial support of schools as mandated by Proposition 98. On appeal, the County contends the "State's action" was invalid because "it mandated a major shift in the use of local property taxes for a specific State purpose, to fulfill the State's obligation under Proposition 98 to provide a constitutionally prescribed minimum amount of public education funding 'from state revenues.'" Thus, the County seeks to challenge both SB 1135 (Rev. & Tax. Code, §§ 97.02, 97.035) and SB 399 (Ed. Code, § 41204.5).

The constitutionality of Education Code section 41204.5, subdivision (c), is not before us on this appeal. This appeal deals only with the reallocation of property tax revenues from local governments and special districts to school and community college districts. The County's concern is with the loss of property tax revenue to it because of the SB 1135 reallocation. How the state treats the reallocation in connection with the mandate of California Constitution, article XVI, section 8 (Proposition 98), is of possible concern to the educational entities which are beneficiaries of the constitutional mandate, but not the County. In short, there is simply no theory based on Proposition 98 and/or the effect of SB 399 upon it, which would, even assuming there were no other obstacles, entitle the County to a writ of mandate compelling compliance with County Ordinance No. 1993-0045, and negating SB 1135. The County lacks standing to raise the issue.

Even assuming the County's standing, the cause of action for declaratory relief, the only cause of action which could have required the trial court to address the validity of SB 399, was dismissed at the County's request. In addition, there are insufficient facts in the present record to permit our evaluation of the effect of SB 399 in this fiscal year. At oral argument, the California Teachers Association, appearing as amicus curiae, explained that this lack is due to a ripeness problem, in that the state appropriation under Proposition 98 is based upon estimates, and it will not be known which of

the three tests set forth in California Constitution, article XVI, section 8 applies until after the end of the fiscal year.[2]

For these reasons, we limit our discussion to the reallocation called for by SB 1135.

## ISSUE

The sole issue presented by this appeal is the propriety of the trial court's ruling denying the County's petition for writ of mandate.[3] The County contends it lawfully directed its officers to ignore SB 1135 because the statute (1) will so impair the County's discretionary control over local affairs as to impermissibly abridge the constitutional right of County residents to home rule (Cal. Const., art. XI, § 4; see also art. XI, § 5, regarding charter cities); and (2) shifts property tax revenue from local governments to schools in violation of article XIII, section 24 of the California Constitution.

## DISCUSSION

### 1. *Historical Perspective*

The County's claim must be viewed from a historical perspective. We review the relative positions of schools and local government agencies with respect to their entitlement to property tax revenue, and the state's power, or lack thereof, to allocate such revenue among the recipients.

### a. *Serrano*

Prior to the decisions of our Supreme Court in *Serrano* (*Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], and *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929]), local revenue sources, primarily the property tax, provided over 60 percent of the funding for K-12 schools. (Rep. of the Sen. Com. on Property Tax Equity and Revenue, June 1991 [June 1991 Senate Committee Report].) The *Serrano* cases held the local school financing system was unconstitutional because a child's educational opportunity was predicated on the local

---

[2]The California Teachers Association also pointed out that, even if subdivision (c) of Education Code section 41204.5 were invalidated, the County would not accomplish its purpose in enacting County Ordinance No. 93-0045. That event would simply trigger suspension of the Proposition 98 formulas for the fiscal year. (Stats. 1993, ch. 66, § 68.) It would not return to the County the funds reallocated to schools pursuant to SB 1135.

[3]Contrary to the County's assertion, this is not an appeal from a judgment entered following the sustaining of a demurrer. The record shows the County's petition for writ of mandate was denied on the merits.

property wealth, or lack thereof, of his or her school district. (5 Cal.3d at pp. 614-615; 18 Cal.3d at pp. 768-769.) The *Serrano* cases required the *state* to ameliorate the disparities in local funding which resulted in unequal educational opportunity.

Subsequent state legislative enactments equalized school district general purpose budgets so that districts with high property values did not have unrestricted dollar resources, and districts with low property values received state subsidies. (June 1991 Sen. Com. Rep., *supra*, at p. 44.)

 b. *Proposition 13*

Proposition 13, now article XIII A of the California Constitution, was adopted by the voters at the June 1978 primary election. Article XIII A limits the maximum amount of any ad valorem tax on real property to 1 percent of the full cash value of the property (§ 1, subd. (a)); restricts the assessed value of real property (§ 2, subd. (a)), and increases in assessed value (§ 2, subd. (b)); requires a two-thirds vote of the Legislature to effect changes in state taxes, and prohibits imposition of new ad valorem, sales or transaction taxes on sales of real property (§ 3); and requires a two-thirds vote of qualified electors of cities, counties and special districts to impose special taxes (§ 4).

The purpose of Proposition 13 was to cut local property taxes. (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, 334 [182 Cal.Rptr. 506, 644 P.2d 192].) Its effect was to drastically cut property tax revenue, and thereby sharply reduce the funds available from that source to local governments, and also schools. (*Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 302 [152 Cal.Rptr. 903, 591 P.2d 1] [*Sonoma County*]; Lefcoe & Allison, *The Legal Aspects of Proposition 13: The Amador Valley Case* (1979) 53 So.Cal.L.Rev. 173, 188.)

 c. *Initial Legislative Response to Proposition 13*

The state responded to Proposition 13 by almost immediately returning several billion dollars accumulated in the state's surplus to local agencies to alleviate the potential effects of the initiative. (Gov. Code, § 16250 et seq. [Sen. Bill No. 154]; *Sonoma County, supra*, 23 Cal.3d at pp. 310-311.) To further accomplish this "bailout," the state took over funding of the Social Security Income-State Supplemental Program (SSI-SSP), the Medi-Cal Program, and the Aid to Families with Dependent Children Program (AFDC). The state also appropriated block grant amounts to counties, cities, special districts, school districts, and community colleges. (Doerr, *The California Legislature's Response to Proposition 13* (1979) 53 So.Cal.L.Rev. 77, 78.)

The remaining property tax revenues were pooled at the county level and distributed as directed by the Legislature among local agencies based on the shares each agency had received in the past. (Gov. Code, § 26912; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 226-227 [149 Cal.Rptr. 239, 583 P.2d 1281] [*Amador*].)

### d. *Amador*

In *Amador*, our Supreme Court upheld the constitutionality of Proposition 13 as so implemented. (*Amador, supra,* 22 Cal.3d at pp. 226-227.) As we shall later discuss, *Amador* found nothing on the face of article XIII A and the legislative implementation there in question which abrogated the home rule provisions of the California Constitution. (22 Cal.3d at pp. 224-227.)

### e. *Further Legislative Response to Proposition 13*

In 1979, the Legislature adopted a permanent relief mechanism (Assem. Bill No. 8) totalling approximately $5 billion. This legislation continued the "bailout" of local governmental agencies. It also shifted property tax revenue from school districts to cities, counties and special districts. At the same time, the state assumed a larger share of responsibility for funding local schools. (Governor's Budget Summary 1993-1994, p. 43.)

By fiscal year 1991-1992, the share of local property tax revenue allocated to K-14 schools had dropped to 35 percent, down from 53 percent in 1977-1978. (Governor's Budget Summary 1993-1994, p. 43.)

In 1992-1993, the Legislature redirected $1.3 billion in property tax revenues from cities, counties, special districts and redevelopment agencies to schools. (Governor's Budget Summary 1993-1994, p. 43.)

As heretofore stated, for the fiscal year 1993-1994, SB 1135 reallocates another approximately $2.6 billion in such revenues from local governments and special districts to schools.

### f. *Measures Mitigating the Effect of SB 1135 Upon Counties*

The state has enacted various measures mitigating the effect of the reallocation of property tax revenue. For example, trailer bills to the 1993-1994 Budget Act removed or suspended duties the counties had been required by statute to perform, or authorized the counties to recoup additional reimbursement for providing such services. (Sen. Bill No. 86, Stats. 1993, ch. 70 (1993-1994 Reg. Sess.); Sen. Bill No. 452, Stats. 1993, ch. 60 (1993-1994 Reg. Sess.); Sen. Bill No. 627, Stats. 1993, ch. 64 (1993-1994 Reg. Sess.); Sen. Bill No. 1033, Stats. 1993, ch. 72 (1993-1994 Reg. Sess.).)

In November 1993, the voters adopted Proposition 172, placing a ½ percent state sales tax rate in the state Constitution effective January 1, 1994. This measure is projected to generate approximately $714 million in additional revenue earmarked for county and city public safety programs in 1993-1994, and approximately $1.5 billion per year thereafter. (Cal. Ballot Pamp., Special Statewide Elec. (Nov. 2, 1993).)

Counties also have the authority to impose additional local sales taxes of $0.25 or a multiple thereof, subject to voter approval. (Rev. & Tax. Code, § 7285; see also *id.*, § 7285.5.) They may also impose special taxes, such as hotel taxes (Rev. & Tax. Code, § 7280) and business license taxes (Rev. & Tax. Code, § 7284).

This abbreviated survey illustrates the fluidity of the fiscal relationship between local governments and schools, with the state shifting property tax revenues and other funds between them in its efforts to cope with the equalization of school funding mandated by *Serrano*, and the revenue shortages precipitated by Proposition 13.

2. *Constitutionality of SB 1135*

a. *The Taxing Power Generally*

■ " '[T]he entire law-making authority of [this] state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly, or by necessary implication denied to it by the Constitution. [Citations.]' " (Italics omitted.) (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215], quoting *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].) " '[A]ll intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. [The] restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." [Citations.]' " (*Ibid.*, italics omitted.)

■ "This principle is of particular importance in the field of taxation, in which the Legislature is generally supreme. As the Supreme Court has declared, 'the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it. [Citations.] Its

power in the field of taxation is limited only by constitutional restrictions.' [Citation.] In other words, the Legislature's authority to impose taxes and regulate the collection thereof exists unless it has been *expressly* eliminated by the Constitution. [Citation.]" (*Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 624 [194 Cal.Rptr. 294].)

Conversely, the power of a local government to tax is not inherent. "The power is derived from the Constitution upon authorization by the Legislature. (Art. XIII, § 24.)" (*City of Woodlake* v. *Logan* (1991) 230 Cal.App.3d 1058, 1065 [282 Cal.Rptr. 27].)

b. *Allocation of Property Tax Revenue*

We are concerned here with the power of the state Legislature, asserted in SB 1135, to allocate among the various competing entities the sharply reduced property tax revenues available after Proposition 13.

Pertinent to our discussion is section 1, subdivision (a) of California Constitution, article XIII A, which declares: "The one percent (1%) tax to be collected by the counties and apportioned *according to law* to the districts within the counties." (Italics added.) The Legislature has read this language "as conferring authority to legislate on the subject and to apportion the tax funds to the local agencies and districts." (*Amador, supra,* 22 Cal.3d at p. 246.)

In *Amador,* California Constitution, article XIII A was challenged on several grounds. The petitioners urged, among other things, "that, by reason of the operation of section 1, subdivision (a) of article XIII A (allocating the revenues from the 1 percent maximum tax 'according to law'), the Legislature is thereby empowered, at its whim, and upon whatever conditions it may impose, to pick and choose among the local agencies, rewarding 'deserving' agencies with substantial amounts while penalizing others by reduced awards." (*Amador, supra,* 22 Cal.3d at p. 225.)

The *Amador* court stated: "Certainly nothing on the face of the article . . . abrogates home rule to this extent, or discloses any intent to undermine or subordinate preexisting constitutional provisions on that subject (Cal. Const., art. XI, §§ 3-7)." (*Amador, supra,* 22 Cal.3d at p. 225.)

*Amador* determined California Constitution, article XIII A is potentially no more threatening to home rule than preexisting constitutional limitations

(art. XIII, §§ 4, 20, 21); article XIII A neither destroys nor annuls the taxing power of local agencies, which retain full authority to impose special taxes if approved by a two-thirds vote of the qualified electors (*id.*, § 4); article XIII A "does not by its terms empower the Legislature to direct or control local budgetary decisions or program or service priorities," and "recent implementing legislation . . . confirms the Legislature's present intention to preserve home rule and local autonomy respecting the allocation and expenditure of real property tax revenues." (*Amador, supra,* 22 Cal.3d at p. 226.)

The legislative implementation in question in *Amador* (Gov. Code, § 26912), contained "the formulae whereby county auditors must allocate to various local agencies and school districts within county boundaries the revenues to be derived from the 1 percent maximum real property tax during the fiscal year 1978-1979." (*Amador, supra,* 22 Cal.3d at pp. 226-227.) The court noted that these formulas, although complex, generally aimed "at allocating these funds on a *pro rata basis,* without imposing any condition whatever regarding their ultimate use. Each 'local agency' (city, county, city and county, and special district) is to receive a proportionate share based upon its average property tax revenues during the previous three fiscal years. (Gov. Code, § 26912, subds. (a), (b)(1).) Similarly, each school district, county superintendent of schools, and community college district, is to receive a proportionate share based upon the entity's average property tax revenues for the 1977-1978 fiscal year. (*Id.,* subd. (b)(2).)" (*Amador, supra,* 22 Cal.3d at p. 227.)

The *Amador* court explicitly cautioned that it did not preclude subsequent challenges such as that made here to the specific meaning or validity of enactments implementing California Constitution, article XIII A. (*Amador, supra,* 22 Cal.3d at p. 220.)

In *City of Rancho Cucamonga* v. *Mackzum* (1991) 228 Cal.App.3d 929 [279 Cal.Rptr. 220] (*Rancho Cucamonga*), a number of cities and individuals complained that the same implementing legislation unlawfully prevented the city plaintiffs, which either did not impose any property tax or imposed a very low property tax prior to Proposition 13, from levying a property tax and from sharing proportionately in property taxes collected by counties. The cities contended the legislation created an arbitrary method of distribution without considering intervening changes such as population growth and the resulting need for capital improvements and public services. They also alleged the legislation violated the state constitutional requirements of tax situs, home rule, uniformity and equal protection. (228 Cal.App.3d at p. 935.)

Two of the plaintiffs in *Rancho Cucamonga* were charter cities which complained the legislation violated the home rule provisions of California Constitution, article XI, section 5. The remaining plaintiff cities argued "that the Legislature did not intend to set up a nonuniform system, and that their taxing powers, as well as those of the charter cities, must be upheld. [Citation.]" (*Rancho Cucamonga, supra,* 228 Cal.App.3d at p. 943, fn. omitted.)

The court pointed out that ". . . the purpose of Proposition 13 itself was to achieve statewide control over escalating local property tax rates. 'Being special in nature and adopted later' [citation], article XIII A prevails over the preexisting taxing power of charter cities. Article XIII A specifies that property taxes shall be 'apportioned according to law.' This clearly evidences a grant of authority to the Legislature to enact implementing legislation." (*Rancho Cucamonga, supra,* 228 Cal.App.3d at p. 945.)[4]

*Rancho Cucamonga* noted *Amador* had acknowledged that Proposition 13 limited the assessment and taxing powers of local governments. However, *Amador* also recognized that the initiative "did not affect local governments' ability to allocate their remaining resources as they saw fit." (*Rancho Cucamonga, supra,* 228 Cal.App.3d at p. 946.)

In *Marin Hospital Dist.* v. *Rothman* (1983) 139 Cal.App.3d 495 [188 Cal.Rptr. 828], a decision dealing with the same implementing legislation, the petitioning special district was precluded by Government Code section 26912 from sharing in tax revenue for the fiscal year 1979-1980 because it had been authorized to, but did not, levy a tax upon real property within its territorial limits for the fiscal year 1977-1978, nor had such a tax been levied for it. The district contended section 26912 impaired its vested right to receive property tax revenues. The court stated: "It is settled law, at least vis-à-vis the Legislature, that local public agencies have no *vested right* to impose taxes . . . . [Citations.]" (139 Cal.App.3d at pp. 501-502.)

c. *This Case*

 The County's position is essentially that the state may not alter the proportionate shares of property tax revenue allocated to local agencies, including counties and schools; regardless of the amount of revenue available, such shares must remain as they were prior to adoption of Proposition 13. We believe this is an unduly restrictive view of *Amador, supra,* 22 Cal.3d 208.

---

[4]*Rancho Cucamonga* is, of course, equally applicable to charter counties.

As we stated above, there is a historical fluidity in the fiscal relationship between local governments and schools. The state has shifted property tax revenue both from schools to local governments, and, as in this case, from local governments to schools. These shifts, including the one presently complained of, have been made in the context of comprehensive legislative planning for the funding of both entities from a variety of sources, including property tax revenue. While SB 1135 shifts property tax revenue away from local governments, the Legislature has enacted other measures designed to ameliorate the effect of this shift. There is nothing in the present record to suggest that the total funding the County will have at its disposal in this fiscal year is impermissibly disproportionate to the total funding available to schools, or that the Legislature has so infringed upon the County's discretionary affairs as to impermissibly interfere with the right of its residents to home rule.

The County contends the state is precluded by California Constitution, article XIII, section 24, from shifting property tax revenues from local governments to schools. Article XIII, section 24 provides: "The Legislature may not impose taxes for local purposes but may authorize local governments to impose them. [¶] Money appropriated from state funds to a local government for its local purposes may be used as provided by law. [¶] Money subvened to a local government under Section 25 may be used for State or local purposes."

The County argues that in SB 1135, the state requires local property taxes to be used for a specific local purpose, and thus imposes taxes for a local purpose in violation of California Constitution, article XIII, section 24. The later-adopted article XIII A, providing that property taxes shall be "apportioned according to law," removed whatever doubt previously may have existed concerning the power of the state to allocate property tax revenue among the entities funded by such revenue. (See *Rancho Cucamonga, supra,* 228 Cal.App.3d at p. 945.)

■ Finally, we note again that the County cannot legislate in the field of taxation unless authorized to do so by the Legislature. (*City of Woodlake v. Logan, supra,* 230 Cal.App.3d at p. 1065.) Obviously, there was no such authorization in this case. Therefore, even assuming invalidity of SB 1135 (Rev. & Tax. Code §§ 97.02 and 97.035), County Ordinance No. 93-0045 is void.

The trial court properly denied the petition for writ of mandate.

## DECISION

The judgment is affirmed.

Klein, P. J., and Hinz, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied June 23, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.