[No. B213703. Second Dist., Div. Four. Jan. 27, 2010.]

LOS ANGELES UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents; CITY OF LOS ANGELES et al., Real Parties in Interest and Respondents.

## COUNSEL

Strumwasser & Woocher, Michael J. Strumwasser, Gregory G. Luke, Aparna Sridhar; John F. Walsh and Gregory L. McNair for Plaintiff and Appellant.

Troutman Sanders, Paul L. Gale, Erik M. Pritchard, Jenece D. Solomon, Peter R. Lucier; Robert E. Kalunian, Acting County Counsel, and Thomas M. Tyrrell, Principal Deputy County Counsel, for Defendants and Respondents County of Los Angeles and J. Tyler McCauley, as Auditor-Controller for the

County of Los Angeles and for Real Parties in Interest and Respondents Antelope Valley Resource Conservation District, Bell Gardens Lighting District, Consolidated Fire Protection District of Los Angeles County, Consolidated Maintenance Sewage District, Firestone Garbage Disposal District, Los Angeles County Flood Control District, Los Angeles County Lighting Maintenance District No. 1697, Los Angeles County Sanitation District, Los Angeles County Sanitation District No. 23-Refuse T & D System, Los Angeles County Sanitation District No. 1 Operating, Los Angeles County West Vector Control District, Mesa Heights Garbage Disposal District and Wilmington Cemetery District.

Kane Ballmer & Berkman, Murray O. Kane, Donald P. Johnson, Susan Y. Cola; Carmen A. Trutanich, City Attorney, and Colleen M. Courtney, Deputy City Attorney, for Defendants and Respondents Community Redevelopment Agency of the City of Los Angeles and Maywood Redevelopment Agency and for Real Parties in Interest and Respondents City of Lynwood, City of Maywood, Culver City and Culver City Redevelopment Agency.

Alvarez-Glasman & Colvin and Roger A. Colvin for Defendant and Respondent City of Bell Gardens Redevelopment Agency and for Real Party in Interest and Respondent City of Bell Gardens.

Robert E. Shannon, City Attorney, and Randall C. Fudge, Deputy City Attorney, for Defendant and Respondent Redevelopment Agency of the City of Long Beach and for Real Party in Interest and Respondent City of Long Beach.

Aleshire & Wynder, June S. Ailin, William W. Wynder and Dawn C. Honeywell for Defendants and Respondents City of Carson Redevelopment Agency and City of Lynwood Redevelopment Agency and for Real Parties in Interest and Respondents City of Carson and City of Lynwood.

Richards | Watson | Gershon, Gregory M. Kunert, Michael Estrada and Roxanne M. Diaz for Defendants and Respondents Community Development Commission of the City of Huntington Park, San Fernando Redevelopment Agency and West Hollywood Redevelopment Agency [West Hollywood Community Development Commission] and for Real Parties in Interest and Respondents City of Huntington Park, City of San Fernando, City of West Hollywood and West Hollywood Lighting Maintenance District.

Jeff A. Harrison and Willard G. Yamaguchi for Defendant and Respondent City of Vernon Redevelopment Agency and for Real Party in Interest and Respondent City of Vernon.

Vanderford & Ruiz, Rodolfo F. Ruiz and Paloma Peracchio for Defendant and Respondent Cudahy Redevelopment Agency and for Real Parties in Interest and Respondents City of Cudahy and City of Cudahy Lighting District Zone 1.

Eduardo Olivo, City Attorney, and Bruce Bartram for Defendant and Respondent Commerce Community Development Commission and for Real Party in Interest and Respondent City of Commerce.

Carpenter, Rothans & Dumont, Steven J. Rothans, Justin Reade Sarno and David G. Torres-Siegrist for Defendant and Respondent City of South Gate Community Development Commission and for Real Party in Interest and Respondent City of South Gate.

Carmen A. Trutanich, City Attorney, and Todd T. Leung, Deputy City Attorney, for Real Party in Interest and Respondent City of Los Angeles.

Sedgwick, Detert, Moran & Arnold and Curtis D. Parvin for Real Party in Interest and Respondent Central Basin Municipal Water District.

Meyers Nave Riback Silver & Wilson and James M. Casso for Real Party in Interest and Respondent Water Replenishment District of Southern California—Central and West Basin.

Lemieux & O'Neill, W. Keith Lemieux, Steven P. O'Neill and Christine Carson for Real Party in Interest and Respondent West Basin Municipal Water District.

Thomas & Thomas, Andrew J. Thomas and J. Michael Echevarria for Real Party in Interest and Respondent Greater Los Angeles County Vector Control District.

Karen L. Tachiki, Sydney B. Bennion and Peter E. von Haam for Real Parties in Interest and Respondents City of Long Beach Area-Southern California Metropolitan Water District, City of Los Angeles Area-Southern California Metropolitan Water District, City of San Fernando Area-Southern California Metropolitan Water District, Central Basin-Southern California Metropolitan Water District and West Basin-Southern California Metropolitan Water District.

Mitchel R. Weinbaum for Real Party in Interest and Respondent Compton Creek Mosquito Abatement District.

## OPINION

SUZUKAWA, J.—This is an appeal from the denial of a petition for writ of mandate. Plaintiff Los Angeles Unified School District (LAUSD) petitioned

to compel defendants County of Los Angeles, City of Los Angeles, and numerous community redevelopment and other local agencies[1] (collectively, the County) to increase its allocation of community redevelopment project mitigation payments (passthrough payments) under Health and Safety Code section 33607.5. We conclude, as a matter of law, that LAUSD's passthrough payments have been based on an erroneous calculation of its percentage share of property taxes. Given that LAUSD's right to reimbursement has yet to be litigated, we reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal presents a single legal issue regarding the correct allocation of LAUSD's passthrough payments under Health and Safety Code section 33607.5. The petition, filed on March 29, 2007, cites two relevant statutory schemes: (1) the Educational Revenue Augmentation Fund (ERAF) legislation (Rev. & Tax. Code, §§ 97.2, 97.3), which was enacted in 1992 as former section 97.03 of the Revenue and Taxation Code (Stats. 1992, ch. 699, § 12, pp. 3093–3096; Stats. 1992, ch. 700, § 4, pp. 3120–3125); and (2) the passthrough legislation (Health & Saf. Code, § 33607.5), which was enacted in the Community Redevelopment Law Reform Act of 1993 (Stats. 1993, ch. 942, p. 5334). Before discussing these two statutes, we briefly review the relevant events preceding their enactment.

Since 1971, the division of state and local responsibility for educational funding has "been in a state of flux." (*City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266, 278 [99 Cal.Rptr.2d 333].) The state's responsibility for educational funding has increased since 1971 for three primary reasons.

First, in the 1970's, the California Supreme Court held that the state must ameliorate the disparities in local property tax-based educational funding. (*Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241]; *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929].) Second, in 1978, the voters adopted Proposition 13, now article XIII A of the California Constitution, which limited local property taxation. (See, e.g.,

---

[1] The defendants are County of Los Angeles; J. Tyler McCauley, as Auditor-Controller for the County of Los Angeles; Community Redevelopment Agency of the City of Los Angeles; Maywood Redevelopment Agency; City of Bell Gardens Redevelopment Agency; Redevelopment Agency of the City of Long Beach; City of Carson Redevelopment Agency; City of Lynwood Redevelopment Agency; Community Development Commission of the City of Huntington Park; San Fernando Redevelopment Agency; West Hollywood Redevelopment Agency; City of Vernon Redevelopment Agency; Cudahy Redevelopment Agency; Commerce Community Development Commission; and City of South Gate Community Development Commission.

*County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1450–1452 [29 Cal.Rptr.2d 103] [after Prop. 13 was adopted, the share of local property tax revenue allocated to K-14 schools dropped from 53 percent to 35 percent by the 1991–1992 fiscal year].) Finally, in 1988, the voters enacted Proposition 98, which established a minimum guaranteed state funding entitlement for schools. (Cal. Const., art. XVI, § 8, subd. (b); see *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1275, fn. 8 [101 Cal.Rptr.2d 784] [under Prop. 98, non-excess-tax school entities are entitled to additional revenue from the state General Fund according to one of three formulas].)

The term "excess tax school entity" refers to "an educational agency for which the amount of the state funding entitlement determined under Section 2558, 42238, 84750, or 84751 of the Education Code, as appropriate, is zero." (Rev. & Tax. Code, § 95, subd. (n).) Under Proposition 98, non-excess-tax school entities (hereafter, schools) are entitled to additional revenue from the state General Fund in order to supplement the funds received from local property taxes. (*County of Sonoma v. Commission on State Mandates, supra,* 84 Cal.App.4th at p. 1275, fn. 8.)

The state's ability to meet its increased financial obligation to schools under Proposition 98 was severely tested in fiscal year 1991–1992, when the state "faced an unprecedented budgetary crisis . . . with expenditures projected to exceed revenues by more than $14 billion." (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 163 [6 Cal.Rptr.2d 714].) In response to this economic crisis, the Legislature enacted the 1992 ERAF legislation, Revenue and Taxation Code former section 97.03[2] (presently § 97.2). The ERAF legislation lessened the burden imposed by Proposition 98 on the state General Fund by reducing the property tax allocation of cities, counties, and special districts, and shifting the amount of the reduction to ERAF's for distribution to schools. (*County of Los Angeles v. Sasaki, supra,* 23 Cal.App.4th at p. 1452; *City of El Monte v. Commission on State Mandates, supra,* 83 Cal.App.4th at p. 272.)

"The ERAF reallocation design can be summarized as requiring reduction of property tax revenues previously allocated to counties by use of a specified formula, deposit of the reduced amounts into ERAF's, and distribution of the ERAF funds to schools. Another portion of the same legislation deemed the ERAF revenues to be part of the state General Fund revenues for purposes of calculating the minimum educational funding guarantee under Proposition 98. [Fn. omitted.] The overall result of these statutes is that the tax revenues of the counties are decreased, school revenues remain the same, and the

---

[2] All further statutory references are to the Revenue and Taxation Code unless otherwise noted.

minimum school funding guarantee of Proposition 98 is satisfied in part by the ERAF funds. This legislative adroitness fulfilled the funding of Proposition 98 by reallocating available finite funds from one local governmental entity to another. (Legis. Analyst, Rep. to Joint Legis. Budget Com., analysis of 1993–1994 Budget Bill, p. 90.) [Fn. omitted.]" (*County of Sonoma v. Commission on State Mandates, supra*, 84 Cal.App.4th at pp. 1275–1276.)

In addition to shifting property taxes from other local entities to ERAF's for distribution to schools, the 1992 ERAF legislation added former section 33681 to the Health and Safety Code (repealed by Stats. 2002, ch. 1127, § 13, operative Jan. 1, 2004), which required redevelopment agencies to make supplemental deposits to ERAF's during fiscal years 1992–1993 and 1993–1994. (Stats. 1992, ch. 699, § 7, p. 3086 & ch. 700, § 1.5, p. 3115.) By subsequent legislation, the Legislature required redevelopment agencies to make supplemental deposits to ERAF's during fiscal years 1994–1995 (Health & Saf. Code, § 33681.7), 2002–2003 (*id.*, § 33681.7), 2003–2004 (*id.*, § 33681.9), 2004–2005 and 2005–2006 (*id.*, § 33681.12). As provided in the Health and Safety Code, redevelopment agencies may make the required supplemental deposits to ERAF's with funds *other* than property taxes.[3]

In short, the ERAF legislation employed two separate funding mechanisms. One required the annual shift of property taxes from other local entities to ERAF's for distribution to schools (§§ 97.2, 97.3), and the other required the occasional deposit of funds (not limited to property taxes) by redevelopment agencies to ERAF's as required by the Health and Safety Code.

The passthrough legislation, which also applies to redevelopment agencies and schools, was enacted in 1993, one year after the ERAF legislation was adopted. (Health & Saf. Code, § 33607.5.) After a redevelopment project is established, all growth in property tax revenue that occurs after the initial or base year[4] is commonly called the property tax increment. When certain requirements are met, a redevelopment agency may retain the property tax

---

[3] For example, Health and Safety Code section 33681.7, subdivision (c) provides that redevelopment agencies may make their supplemental ERAF deposits with any funds that are legally available and not legally obligated for other uses, including reserve funds, land sale proceeds, bond proceeds, lease revenues, interest, and earned income. (See also Health & Saf. Code, §§ 33681.9, subd. (c) [same], 33681.12, subd. (c) [same].)

[4] Health and Safety Code section 33670 provides in relevant part that a "redevelopment plan may contain a provision that taxes, if any, levied upon taxable property in a redevelopment project . . . after the effective date of the ordinance approving the redevelopment plan, shall be divided as follows: [¶] (a) That portion of the taxes . . . , last equalized prior to the effective date of the ordinance, shall be allocated to and . . . paid to the respective taxing agencies as taxes . . . on all other property are paid . . . ; and [¶] (b) . . . that portion of the levied taxes each year in excess of that amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys

increment and apply it toward the indebtedness incurred in financing the redevelopment project. (Cal. Const., art. XVI, § 16, subds. (a), (b); see 11 Miller & Starr, Cal. Real Estate (3d ed. 2004) § 30B:6, p. 16.)

The passthrough legislation requires redevelopment agencies to share or pass through a portion of the property tax increment to affected local taxing entities, including schools. The Legislature declared passthrough payments are "necessary . . . to alleviate the financial burden and detriment that affected taxing entities may incur as a result of the adoption of a redevelopment plan, and payments made pursuant to this section will benefit redevelopment project areas." (§ 33607.5, subd. (f)(1)(A).) Passthrough payments uniquely benefit schools in that they are deemed to contain fixed percentages of property tax and non-property-tax revenue, and only the latter may be used for educational facilities. (Health & Saf. Code, § 33607.5, subd. (a)(4).)[5]

This litigation involves the overlap that exists between the ERAF and the passthrough legislation because the passthrough payments must be "allocated among the affected taxing entities . . . in proportion to the percentage share of property taxes each affected taxing entity . . . receives during the fiscal year the funds are allocated . . . ." (Health & Saf. Code, § 33607.5, subd. (a)(2).) In other words, the statutes overlap because the correct allocation of the

advanced to, or indebtedness . . . incurred by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project. . . ."

[5] "(4)(A) Except as specified in subparagraph (E), of the total amount paid each year pursuant to this section to school districts, 43.3 percent shall be considered to be property taxes for the purposes of paragraph (1) of subdivision (h) of Section 42238 of the Education Code, and 56.7 percent shall not be considered to be property taxes for the purposes of that section and shall be available to be used for educational facilities.

"(B) Except as specified in subparagraph (E), of the total amount paid each year pursuant to this section to community college districts, 47.5 percent shall be considered to be property taxes for the purposes of Section 84751 of the Education Code, and 52.5 percent shall not be considered to be property taxes for the purposes of that section and shall be available to be used for educational facilities.

"(C) Except as specified in subparagraph (E), of the total amount paid each year pursuant to this section to county offices of education, 19 percent shall be considered to be property taxes for the purposes of Section 2558 of the Education Code, and 81 percent shall not be considered to be property taxes for the purposes of that section and shall be available to be used for educational facilities.

"(D) Except as specified in subparagraph (E), of the total amount paid each year pursuant to this section for special education, 19 percent shall be considered to be property taxes for the purposes of Section 56712 of the Education Code, and 81 percent shall not be considered to be property taxes for the purposes of that section and shall be available to be used for education facilities.

"(E) If, pursuant to paragraphs (2) and (3), an agency reduces its payments to an educational entity, the calculation made by the agency pursuant to paragraph (3) shall determine the amount considered to be property taxes and the amount available to be used for educational facilities in the year the reduction was made." (Health & Saf. Code, § 33607.5, subd. (a)(4)(A)–(E).)

passthrough payments is dependent upon the correct calculation of the percentage share of property taxes that each affected taxing entity receives during the fiscal year the funds are allocated.

The parties agree that the County has consistently ignored LAUSD's ERAF revenue in calculating its percentage share of property taxes. This led to the present dispute regarding the proper allocation of LAUSD's passthrough payments, which by statute is based on its percentage share of property taxes. In the bifurcated proceedings below, the trial court considered only the allocation issue, leaving LAUSD's reimbursement claim for another date.

The trial court held that although LAUSD undeniably received ERAF revenue that was comprised primarily of property taxes, it was properly excluded from the calculation of its percentage share of property taxes. The trial court reasoned that because the passthrough legislation does not mention the ERAF legislation, the statutes "are separate statutory schemes that were not intended to be read together. Conflating the statutes as LAUSD requests would result in LAUSD obtaining a financial windfall to the detriment of non-school taxing entities. The Legislature does not appear to have intended such a result."

The trial court entered judgment for the County. LAUSD has timely appealed.

## DISCUSSION

The resolution of this appeal requires the statutory interpretation of the ERAF and the passthrough legislation. There are no disputed issues of material fact.

### I. *Standard of Review*

■ "Under the rules of statutory construction, we bear in mind that our primary task is to determine the intent of the Legislature so as to effectuate the purpose of the law. (*Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862 [35 Cal.Rptr.2d 809].) In determining legislative intent, we first look to the statutory language itself. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) 'The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' (*Id.* at p. 1387.)" (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 909 [114 Cal.Rptr.2d 708].)

"Statutory interpretation is a question of law, which we review de novo. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) When statutory language is clear and unambiguous, there is no need for construction and we shall not indulge in it. (*Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 73 [276 Cal.Rptr. 130, 801 P.2d 373]; *Squaw Valley Ski Corp.* v. *Superior Court* (1992) 2 Cal.App.4th 1499, 1512 [3 Cal.Rptr.2d 897].)" (*San Miguel Consolidated Fire Protection Dist.* v. *Davis* (1994) 25 Cal.App.4th 134, 146 [30 Cal.Rptr.2d 343] (*San Miguel*).)

II. *The ERAF Legislation Was Incorporated into the Yearly Allocation of Property Taxes*

For the reasons that follow, we conclude that the answer to this appeal is found in the clear and unambiguous language of subdivision (d)(5) of sections 97.2 and 97.3 (jointly, subdivision (d)(5)).[6] Given that it was not raised below or on appeal, we invited the parties to address subdivision (d)(5) in supplemental letter briefs.

▮ Section 96.1,[7] which provides the basic method of allocating property taxes, allocates each jurisdiction's[8] yearly property tax revenue based upon its previous allocation in the prior fiscal year. Subdivision (d)(5), which incorporates the ERAF legislation into section 96.1's yearly allocation of property taxes, states in relevant part: "For purposes of allocations made pursuant to Section 96.1 . . . , the amounts allocated from the Educational Revenue Augmentation Fund pursuant to this subdivision, other than amounts deposited in the Educational Revenue Augmentation Fund pursuant to . . . the

---

[6] In light of our determination that the statutory language is clear and unambiguous, we deny LAUSD's supplemental request for judicial notice filed on November 10, 2009.

[7] Section 96.1, subdivision (a) provides in relevant part that "property tax revenues shall be apportioned to each jurisdiction pursuant to this section and Section 96.2 by the county auditor, subject to allocation and payment of funds as provided for in subdivision (b) of Section 33670 of the Health and Safety Code, to each jurisdiction in the following manner: [¶] (1) For each tax rate area, each jurisdiction shall be allocated an amount of property tax revenue equal to the amount of property tax revenue allocated pursuant to this chapter to each jurisdiction in the prior fiscal year, modified by any adjustments required by Section 99 or 99.02. [¶] (2) The difference between the total amount of property tax revenue and the amounts allocated pursuant to paragraph (1) shall be allocated pursuant to Section 96.5, and shall be known as the 'annual tax increment.' [¶] (3) For purposes of this section, the amount of property tax revenue referred to in paragraph (1) shall not include amounts generated by the increased assessments under Chapter 3.5 (commencing with Section 75)."

[8] The term "jurisdiction" includes local agencies (cities, counties, and special districts), school districts, community college districts, and county superintendents of schools. (§ 95, subds. (a), (b).)

Health and Safety Code, shall be deemed property tax revenue allocated to the Educational Revenue Augmentation Fund in the prior fiscal year."[9]

■  By incorporating the ERAF legislation into section 96.1's yearly allocation of property taxes, the Legislature implemented an annual shift of property taxes to ERAF's for distribution to the schools. Although this shift was implemented at the expense of cities, counties, and special districts, the Legislature was clearly authorized to make this redistribution (Cal. Const., art. XIII A, § 1; *San Miguel, supra,* 25 Cal.App.4th at pp. 148–149), and "[i]t is not the province of the judiciary to second-guess the wisdom of legislative appropriations." (*San Miguel, supra,* at p. 149, fn. 12.)

As explained in *San Miguel, supra,* 25 Cal.App.4th at page 143, local governments exercise only those powers that are granted by the state for the purpose of advancing state policy. (*County of Marin v. Superior Court* (1960) 53 Cal.2d 633, 638–639 [2 Cal.Rptr. 758, 349 P.2d 526].) As against the state, local governments have no vested right to receive property tax revenues and have no property interest in those revenues. (*Marin Hospital Dist. v. Rothman* (1983) 139 Cal.App.3d 495, 501 [188 Cal.Rptr. 828]; *Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286, 297 [268 Cal.Rptr. 219].) Because local moneys are public moneys acquired under the authority of the state for public purposes, the Legislature may direct a local government to make any payment of its funds that it sees fit. (*Conlin v. Board of Supervisors* (1893) 99 Cal. 17, 21 [33 P. 753].) " '[A]*ll* property under the care and control of a county is merely held in trust by the county for the people of the entire state. . . . The county holds all its property . . . as agent of the state. [Citations.]' (*County of Marin v. Superior Court, supra,* 53 Cal.2d at pp. 638–639.)" (*San Miguel, supra,* 25 Cal.App.4th at p. 143.)

III.  *Any Property Tax Revenue Deemed Allocated to ERAF's Under Subdivision (d)(5) Necessarily Qualifies As Property Tax Revenue to the School That Received It*

■  The Legislature requires that passthrough payments must be "allocated among the affected taxing entities . . . in proportion to the percentage share of property taxes each affected taxing entity . . . receives during the fiscal year the funds are allocated . . . ." (Health & Saf. Code, § 33607.5,

---

[9] Subdivision (d)(5), as first enacted in 1992, stated that property taxes received by schools through the ERAF's were to be treated, with the exception of supplemental payments made by redevelopment agencies pursuant to former section 33681 of the Health and Safety Code, as "property tax revenue allocated to a *jurisdiction* in the prior fiscal year." (Former § 97.03, subd. (d)(4), added by Stats. 1992, ch. 700, § 4, p. 3124, italics added.) In October 1992, the term "jurisdiction" was replaced by the term "the Educational Revenue Augmentation Fund." (Former § 97.03, subd. (d)(5), as amended by Stats. 1992, ch. 1369, § 10, p. 6885.)

subd. (a)(2).) LAUSD contends that because it undeniably receives ERAF revenue that is allocated as property taxes to the ERAF under subdivision (d)(5), it must be included in the calculation of its percentage share of property taxes, which will necessarily increase its future passthrough allocations. We agree.

■ Subdivision (d)(5) plainly and unambiguously states that property tax revenue shifted to ERAF's under sections 97.2 and 97.3 is deemed property tax revenue allocated to the ERAF's. Given that, in the County's words, "ERAFs are merely an accounting device," we are compelled to conclude that any property tax revenue deemed allocated to ERAF's under subdivision (d)(5) necessarily qualifies as property tax revenue to the school that received it.

The County contends that because the passthrough legislation (Health & Saf. Code, § 33607.5, subd. (a)(2)) does not mention the ERAF legislation (§§ 97.2, 97.3), the Legislature did not intend to include ERAF's in the passthrough allocations. We are not persuaded. By its terms, the passthrough legislation requires the County to allocate the passthrough payments according to the percentage share of property taxes that each affected taxing entity receives in a fiscal year. It is impossible to calculate correctly the property taxes that LAUSD receives while excluding the property taxes received from ERAF's.

When faced with overlapping statutes such as the ERAF and passthrough legislation, we must read them together so as to give effect, to the extent possible, to all of their provisions. (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates, supra*, 94 Cal.App.4th at p. 909.) Adopting the County's interpretation of the passthrough legislation would effectively eliminate subdivision (d)(5) from the ERAF legislation, which we decline to do.

The County argues that the annual shift of property taxes to ERAF's pursuant to subdivision (d)(5) is irrelevant to this appeal because only the state will benefit from a reduction in its funding obligation under Proposition 98. The County asserts that schools receive no benefit from subdivision (d)(5) because their ERAF revenue must be deducted from their annual revenue limit in order to determine the state's required Proposition 98 contribution. The County contends that including the ERAF revenue in the passthrough allocations would unfairly give the schools "an unintended windfall—at the expense of the other affected taxing entities (the cities, counties and special districts)."

However, none of these assertions is persuasive in light of the Legislature's clear and unambiguous declaration in subdivision (d)(5) that the shifted

property taxes are "deemed property tax revenue allocated" to the ERAF. Regardless of the benefit to schools or the detriment to other affected taxing entities, it is not our province "to second-guess the wisdom of legislative appropriations. The forums for addressing this issue lie with the voters and the Legislature." (*San Miguel, supra*, 25 Cal.App.4th at p. 149, fn. 12.)

If the Legislature had intended to exclude ERAF revenue from the passthrough allocations, we are confident that it knew "how to express such a concept." (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates, supra*, 94 Cal.App.4th at p. 911.) We view its failure to do so as intentional rather than accidental, particularly when considered in conjunction with the clear and unambiguous language of subdivision (d)(5).

Finally, we note that the County's reliance on the State Controller's Office two-part review report is misplaced. We have found nothing in the report to indicate that it was intended to address the legal issue presented on appeal.

IV. *Supplemental ERAF Deposits by Redevelopment Agencies Under the Health and Safety Code May Be Excluded from the Passthrough Allocations*

The County contends that because the Health and Safety Code allows redevelopment agencies to make supplemental ERAF deposits with non-property-tax revenue, and because there is no mechanism for identifying and subtracting the non-property-tax revenue from the ERAF's, it may safely ignore all ERAF revenue in allocating the passthrough payments. We agree with the County's first two premises, but disagree in part with its conclusion.

Unlike the property taxes that are shifted to ERAF's pursuant to sections 97.2 and 97.3, supplemental deposits by redevelopment agencies may be made with non-property-tax revenue. Given that subdivision (d)(5) contains an exception that effectively precludes the County from treating the supplemental deposits as property taxes allocated to ERAF's, we conclude they were not intended to be treated as such. In our view, subdivision (d)(5) clearly differentiates between property taxes that are shifted and allocated to ERAF's, and supplemental deposits that may be made from other revenue sources and are not allocated to ERAF's. In light of this distinction, we conclude the supplemental ERAF deposits made by redevelopment agencies under the Health and Safety Code may be excluded from the passthrough allocations.

According to LAUSD's opening brief, the impact of this distinction is relatively small. LAUSD states that according to historical figures, "the

supplemental contributions to ERAF required to be made by [redevelopment agencies] amount to only 1.64 percent of the total funds in ERAF . . . . [T]he supplemental contributions to ERAF required of [redevelopment agencies] amount to only 3 percent of the tax increment received by" redevelopment agencies.

### DISPOSITION

The judgment is reversed and the matter remanded for further proceedings. Appellant LAUSD is awarded its costs on appeal.

Willhite, Acting P. J., and Manella, J., concurred.

A petition for a rehearing was denied February 23, 2010, and the petition of all respondents for review by the Supreme Court was denied April 28, 2010, S180790.